## In re WISCONSIN CO-OPERATIVE MILK POOL.

### No. 21329.

District Court, E. D. Wisconsin.

Nov. 27, 1940.

Vernon Swanson, Bert Vandervelde, and Miller, Mack and Fairchild, all of Milwaukee, Wis., for creditors.

William H. Riley, of Madison, Wis. (Kenneth M. Orchard, of Madison, Wis., of counsel), for bankrupt.

DUFFY, District Judge.

Creditors of the Wisconsin Co-operative Milk Pool have filed a petition in this court asking that the Milk Pool be adjudicated an involuntary bankrupt. This co-operative association (hereinafter for convenience referred to as the "Milk Pool" or "Pool") was organized under Chapter 185 of the Wisconsin Statutes, to operate on a nonstock, nonprofit basis.

The question raised by the answer of the alleged bankrupt and now here for decision is whether under the Bankruptcy Act this nonprofit co-operative association is amenable to adjudication as an involuntary bankrupt.

Section 4 of the Bankruptcy Act, 11 U.S.C.A. § 22, provides: "Who may become bankrupts. * * * b. Any natural person, except a wage earner or farmer, and any moneyed, business, or commercial corporation, except a building and loan association, a municipal, railroad, insurance, or banking corporation, owing debts to the amount of $1,000 or over, may be adjudged an involuntary bankrupt * * *."

Whether such a co-operative association as here involved may be adjudicated bankrupt upon petition of its creditors has been before the courts for decision several

788

times, and there is a sharp conflict in the conclusions which have been reached.[1] In view of this conflict of authority, a close examination and analysis should be made to determine the intention of Congress and this in turn involves an analysis of the type of association here involved.

Membership in the Milk Pool is acquired by a dairy farmer executing a membership contract which in effect designates the Pool as the exclusive marketing agent of the member. The Pool also markets the products of patrons who are not members of the Pool. However, 65% of the patrons of the Milk Pool are active members thereof.

■ The formation and development of co-operatives for the marketing of agricultural commodities has been encouraged both by state and federal laws. It was generally recognized that the marketing of agricultural products was one of the most difficult problems with which farmers of this country had to contend. The spread in price between what the farmer received for his products and the amount that the consumer paid was so large that both state legislatures and Congress have given consideration to the problem of simplifying the marketing of agricultural products. Wisconsin was one of the leading states to pass laws to authorize and encourage co-operatives, and it may be said that co-operative associations for the marketing of agricultural products have a favored status under both the federal laws and the laws of Wisconsin. As an illustration, the federal income tax law exempts them.[2] The Supreme Court of the United States has stated[3]: "The opinion generally accepted—and upon reasonable grounds, we think—is that the co-operative marketing statutes promote the common interest. * * * This Court has recognized as permissible some discrimination intended to encourage agriculture."

The Supreme Court of Wisconsin has said[4]: " * * * this court has definitely held that agriculture cooperatives are favored in the law * * *."

The Wisconsin Statutes likewise show that special considerations have been extended to agricultural co-operatives. A special liquidation proceeding has been provided in the state courts.[5] If any corporation discriminates against a co-operative, its charter may be annulled if it is a domestic corporation or its license revoked if it be a foreign corporation.[6] In order to hold the association together, membership contracts are enforceable against the member by restraining order and injunction.[7] To insure control by patron members, each member has but one vote.[8] Likewise the vote of a stockholder may be forfeited by loss of membership.[9] The legislative policy of the state is expressly set forth in the statutes[10]: "The history of the farm marketing problem in the state and nation, as well as throughout the world, points to a solution chiefly through co-operative marketing efforts of producers. It is, hence, declared to be the policy of this state, in advancing the gen-

---

[1] Cases holding co-operatives amenable: Schuster v. Ohio Farmers' Co-op. Milk Ass'n, 6 Cir., 61 F.2d 337; In re South Shore Co-operative Ass'n, Inc., D. C., 4 F.Supp. 772; Roumanian Workers Educational Ass'n of America v. Popovich, 6 Cir., 108 F.2d 782 (this latter case does not involve a co-operative but follows the reasoning in Schuster v. Ohio Farmers' Co-op., etc., supra). Cases holding contra are: In re Dairy Marketing Ass'n of Ft. Wayne, Inc., D.C., 8 F.2d 626; In re Weeks Poultry Community, Inc., D.C., 51 F.2d 122.

[2] Regulations 103, Sec. 19.101 (12)–1, provide: "(a) Co-operative associations engaged in the marketing of farm products for farmers, fruit growers, live stock growers, dairymen, etc., and turning back to the producers the proceeds of the sales of their products, less the necessary operating expenses, on the basis of the products furnished by them, are exempt from income tax and shall not be required to file returns. For instance, co-operative dairy companies which are engaged in collecting milk and disposing of it or the products thereof and distributing the proceeds, less necessary operating expenses, among the producers upon the basis of the quantity of the milk or of butter fat in the milk furnished by such producers, are exempt from the tax."

[3] Liberty Warehouse Co. v. Burley Tobacco Growers' Co-operative Marketing Ass'n, 276 U.S. 71, 96, 48 S.Ct. 291, 297, 72 L.Ed. 473.

[4] State ex rel. Wisconsin Development Authority v. Dammann, 228 Wis. 147, 188, 189, 277 N.W. 278, 280 N.W. 698, 712.

[5] Sec. 185.165, Wisconsin Statutes.

[6] Sec. 185.08 (10), Wisconsin Statutes.

[7] Sec. 185.08(4), Wisconsin Statutes.

[8] Sec. 185.01, Wisconsin Statutes.

[9] Sec. 185.081, Wisconsin Statutes.

[10] Sec. 94.15, Wisconsin Statutes.

eral good and public welfare, to assist in the organization and development of co-operative associations for production and marketing purposes along lines of dairy and other farm products."

The Wisconsin Supreme Court recognized the soundness of this policy when it stated[11]: "It was for the purpose of encouraging efforts to bring about more direct marketing methods, thus benefiting both producer and consumer, and thereby promoting the general interest and the public welfare, that the legislation was enacted."

█ In Section 4, sub. b, Congress declared that certain kinds of moneyed, business, or commercial corporations are not subject to involuntary bankruptcy. It did not enumerate the types of nonprofit organizations which would be exempt because it was undoubtedly the intention to permit the states to define what such a nonprofit organization might be. The Circuit Court of Appeals of the 2nd Circuit in a case concerned with the definition of an insurance company under Section 4, sub. b, said[12]: "The purpose of Congress in the amendment of 1910 to section 4, 11 U.S.C.A. § 22, was to make a comprehensive definition with certain exceptions, rather than to enumerate the kinds of companies which were subject to bankruptcy. The purpose of the exception is not self-evident; we must infer it as best we can from such similarity as exists between the excepted groups. * * * The most natural inference is that Congress meant to leave to local winding up statutes the liquidation of such companies; that, since the states commonly kept supervision over them during their lives, it was reasonable that they should take charge on their demise."

And further in the opinion, the court said (75 F.2d at page 985): "It is true that this makes the meaning of section 4 depend upon local laws and subjects that meaning to change as those laws change; pro tanto, Congress has delegated its power. But this is not the only instance in the Bankruptcy Act; thus exemptions are dependent upon local law, section 6, 11 U.S.C.A. § 24, and so are the priorities among claims, section 64b [11 U.S.C.A. § 104] * * *."

The Milk Pool was engaged in business pursuits, but that does not necessarily prove that the Pool was a business or commercial corporation. A hospital charges for the services which it renders, but it may remain a nonprofit institution. An eleemosynary institution may carry on many business activities incidental to its main purpose, and no one would contend that it thereby became a business, moneyed, or commercial corporation. The Pool did receive an income from various sources, but such income was not necessarily a "profit" in the ordinary sense of the word. The Milk Pool did not purchase the products of its members or patrons; it acted as their marketing agent. It was the well established business practice that patrons were paid only after their product had been sold and a remittance therefor had been received by the Pool. When processing equipment and supplies were sold by the Pool, part of the trade discount which had been received was passed on to the purchasers who were members or patrons, and the balance was retained by the Pool to apply on operating expenses. The check-off, the service charges, the paraffining and hauling gains were set up for the purpose of meeting operating expenses. All such deductions were made on a volume basis. There were never any net proceeds above operating expenses, but if any surplus had developed, a patronage dividend would have returned to the patrons any excess on the basis of the volume of the patronage.

█ Although there is respectable authority to the contrary, the better rule would seem to be that the classification of a corporation under Section 4, sub. b, of the Bankruptcy Act should be determined both from its articles of organization and its activities.[13] While the articles of organization of the Milk Pool gave wide latitude, the evidence discloses that its principal activity was the marketing of the produce of its members and patrons.

"Where a corporation is engaged in two or more distinctive lines of business, one of which would subject it to the Bankruptcy Law, while the other would not, the decision of its amenability to the involuntary Bankruptcy Act will depend on the nature and character of that business

[11] Northern Wisconsin Co-operative Tobacco Pool v. Bekkedal, 182 Wis. 571, 590, 197 N.W. 936, 943.

[12] In re Union Guarantee & Mortgage Co., 75 F.2d 984.

[13] Roumanian Workers Educational Ass'n of America v. Popovich, supra.

which, under all the facts and circumstances, constitutes its chief or principal pursuit. Cate v. Connell [1 Cir.], 173 F. 445, 97 C.C.A. 647. In re Interstate Paving Co. (D.C.) 171 F. 604."[14]

The provisions of the Bankruptcy Act are to be construed liberally in favor of the debtor.[15] The burden is on the petitioning creditors to prove that the alleged bankrupt does not fall within one of the exempted classes.[16] The Bankruptcy Act should not be construed to include any corporation not clearly within the enumerated classes.[17] A farmer could not be thrown into involuntary bankruptcy. Section 4, sub. b. The petitioning creditors here have the burden to show that this co-operative association, made up entirely of farmers, comes within the Bankruptcy Act.

It is our conclusion that the Wisconsin Co-operative Milk Pool, being a nonstock, nonprofit co-operative marketing association, is neither a moneyed, business, nor commercial association, and is not subject to an involuntary bankruptcy proceeding.

The petition will, therefore, be dismissed.

[14] In re Dairy Marketing Ass'n, etc., supra, 8 F.2d at page 627.

[15] In re Michigan Sanitarium & Benevolent Ass'n, D.C., 20 F.Supp. 979.

[16] 1 Remington on Bankruptcy, § 182.-

50; Canal Bank & Trust Company v. Brewer, 5 Cir., 18 F.2d 93.

[17] In re New York & New Jersey Ice Lines, 2 Cir., 147 F. 214; In re Dairy Marketing Ass'n, etc., supra.