**In re FIDELITY ASSUR. ASS'N.**

District Court, S. D. West Virginia.
Dec. 24, 1941.

Townsend & Townsend (T. C. Townsend and Hillis Townsend), of Charleston, W. Va., for Central Trust Co., trustee.

James R. Fleming, of Fort Wayne, Ind., and John V. Ray, of Charleston, W. Va., for debtor.

Justin N. Reinhardt, Edward C. Jaegerman, and John P. Moore, all of Washington, D. C., for Securities and Exchange Commission.

Allen H. Blondy, of Detroit, Mich., for Contract Holders Paul V. Lundstedt and Lelia Lundstedt.

Austin V. Wood, of Wheeling, W. Va., for Edward W. Driehorst and others, certificate holders of debtor.

Raymond Huwe and John J. Rivers, both of Cincinnati, Ohio, for A. Clyde Ross, trustee, and others.

Rudolph K. Schurr, of St. Louis, Mo., for Dewey S. Godfrey, receiver for Missouri policyholders.

Rickard H. Lauritzen, of Madison, Wis., for Banking Commission of State of Wisconsin and others.

Edmund Burke, of Springfield, Ill., for S. Leigh Call, receiver in Illinois.

W. F. Gray, of Springfield, Ill., for Secretary of State and Treasurer of State of Illinois.

Dorr E. Warner, of Cleveland, Ohio, for Bertha Thornton and others, contract holders.

Earl B. Swarner, of Kansas City, Kan., for V. M. Huffman, Securities Commissioner of State of Kansas.

Dale Dunifon, First Asst. Atty. Gen., and David M. Spriggs and Howard Bernstein, Asst. Attys. Gen., all of Columbus, Ohio, for Treasurer of State of Ohio.

Fyke Farmer, of Nashville, Tenn., for L. H. Brooks, A. L. Goldberg, Jr., and Frederick Leake, Contract Holders.

Price, Smith & Spilman (Robert S. Spilman, Jr.), of Charleston, W. Va., for George Melcher and others, Protective Committee of Missouri Contract Holders.

Clarence W. Meadows, Atty. Gen. of State of West Virginia, of Charleston, W. Va., for Edgar B. Sims, State Auditor and Ex Officio Insurance Commissioner of State of West Virginia.

Koontz & Koontz (J. Campbell Palmer, III), of Charleston, W. Va., for H. Isaiah Smith and Ross B. Thomas, Receivers of Debtor, appointed by Circuit Court of Kanawha County, West Virginia.

H. Vernon Eney and Guy B. Brown, both of Baltimore, Md., for Insurance Commissioner of State of Maryland.

MOORE, District Judge.

On June 6, 1941, Fidelity Assurance Association filed its petition under Chapter X of the Chandler Act, 11 U.S.C.A. § 501 et seq., as debtor, praying for corporate reorganization. After an ex parte hearing, the court entered an order approving the petition, enjoining various persons including receivers theretofore appointed by State courts, both in and outside the State of West Virginia, from disposing of any of the property of the debtor; appointing Central Trust Company of Charleston, West Virginia, as trustee for the debtor, and requiring the receivers to turn over to the trustee all property of the debtor in their hands. On June 10, 1941, the court further ordered all state officials, both in and outside the State of West Virginia, having in their possession, custody or control any of the debtor's property, to deliver such property to the trustee, and on the same day the court fixed the 5th day of August, 1941, as the date for a plenary hearing on the debtor's petition. Ross B. Thomas and H. Isaiah Smith, receivers appointed by the Circuit Court of Kanawha County, West Virginia, delivered to the trustee under protest the property of the debtor in their possession. The Ohio receiver turned over to the trustee without protest the property of the debtor in his possession.

Edgar B. Sims, Auditor and ex-officio Insurance Commissioner of the State of West Virginia, Ross B. Thomas and H. Isaiah Smith, the West Virginia receivers, and various other state court receivers and state depositaries of securities of the debtor outside the State of West Virginia, as well as certain groups of creditors, were permitted to intervene and file answers controverting the allegations of debtor's petition.

The hearing which began on August 5, 1941, was continued from time to time until the 10th day of October, 1941, during which time nearly 4,000 pages of tes-

timony were taken and 123 exhibits filed, at the conclusion of which hearing the court heard the argument of counsel upon the questions at issue.

During the course of the hearing, on August 9, 1941, the court entered an order modifying the orders of June 6, 1941, and June 10, 1941, so as to eliminate therefrom any requirement that property of the debtor in possession, custody or control of any state official on April 11, 1941, should be turned over or delivered to the debtor's trustee in this proceeding. The West Virginia Insurance Commissioner, the receivers appointed by the Circuit Court of Kanawha County, West Virginia, and the Insurance Commissioner of Maryland, who appeared specially for that purpose, filed motions that the orders of June 6, 1941, and June 10, 1941, be further modified by eliminating all injunctive provisions against them, respectively, on the ground, substantially, that the effect thereof is to subject sovereign states to suit contrary to the provisions of the Federal Constitution; and as to property already delivered by the receivers to the trustee, that the orders be rescinded and the trustee required to return such property.

The case is now submitted to the court upon the questions (1) whether debtor's petition shall be approved or dismissed, (2) whether the injunction "freezing" deposits in the hands of state depositaries should be dissolved, and (3) whether the orders requiring receivers to turn over certain assets of the debtor in their hands to the Central Trust Company as trustee of the debtor should be rescinded.

### Statement of Facts.

Debtor was incorporated under the laws of the State of West Virginia on April 26, 1911, under the name of Fidelity Investment & Loan Association. Its objects and purposes as set forth in its original charter were to engage in a general brokerage business in securities, real estate and insurance; and for a period of approximately a year and one-half it carried on a general brokerage business. In November, 1912, it changed its name to Fidelity Investment Association and amended its charter so as to provide for conducting "the business of soliciting and receiving deposits and payments on any annuity contracts, certificates or annuity bonds." This charter amendment brought the company under the provisions of what is now Article 9 of Chapter 33 of the Code of West Virginia, 33-9-1 et seq., relating to annuity contracts. Since the change of name and amendment of the charter in November, 1912, debtor has been engaged solely in the business of selling its own securities in the form of investment contracts or bonds of various types and the investment of the funds received from purchasers of such contracts so as to provide for their payment at maturity, according to their terms, or for payment of specified cash values at various stages in the life of the individual contract, if required by the purchaser. If a purchaser paid all the installments of his contract to maturity, he received a net return on the money invested which ranged from 1.55% to 3.09%, depending on the type of contract. The cash values were so fixed that it was not until the purchaser had paid all of the first year's installments that his contract was given any cash value whatever. Thereafter it acquired a cash value which increased proportionately as the years passed; but the cash value did not equal the total amount paid in by the purchaser until the end of a period varying from six to nine years, again depending on the type of contract. Contracts were matured when monthly installments had been paid for a period of ten to eleven years with a subsequent waiting period of three to thirteen months. About the year 1934 debtor began issuing a contract known as Series B contract, the sale of which from that time on constituted the major portion of debtor's business. Series B contracts were issued and sold in two forms. One of these contained a provision commonly referred to as Section 6, by the terms of which it was agreed that the debtor would protect the unpaid portion of those contracts containing Section 6 by procuring an insurance policy which would provide that the contract of any purchaser who died before the maturity of his contract and while the same was in good standing would be paid to maturity (or the commuted value of a paid-up contract would be paid to the purchaser's estate) without further payment of any monthly installments. The net return to the purchaser of this Series B contract containing Section 6, after allowing for the amounts deducted to pay the premiums on the insurance, was 1.55%.

While the various types of investment contracts sold by the debtor differ in some

respects, they are all alike in providing for monthly, semi-annual or annual payments of specified sums, of which a sufficient portion was to be set aside in a reserve fund which was to produce the sum required to pay the purchaser the amount of money agreed upon in the contract. The earlier contracts contained no statement as to the basis of the reserve fund. Of the later contracts, some provided for reserves on a 4½% basis and some on a 4% basis. All provided that the reserve fund so set aside should "be invested in approved securities and deposited in trust as required by the laws of the State of West Virginia."

During the course of its history, the debtor expanded its business to a point where it was conducting operations in no fewer than 29 states. Section 3 of Article 9 of Chapter 33 of the Code of West Virginia provides that companies such as the debtor, as a condition to receiving a license to transact business in the State of West Virginia, must deposit with the state treasurer in trust for the benefit of its contract holders securities approved by the Insurance Commissioner of West Virginia, in the amount of $100,000 "and, in addition to such deposit * * * shall maintain at all times a deposit with the state treasurer * * * to an amount equal to the total amount" for which the corporation may be liable in cash to the holders of all contracts at any particular time. It is further provided that where other states require the corporation to make deposits therein to secure contract holders in such other states, the amount of deposits made in the other states may be deducted from the total amount required to be deposited with the Treasurer of the State of West Virginia. Some of the other states in which debtor transacted business required deposits of securities to be made, while others did not. The other states requiring deposits were Wisconsin, Illinois, Ohio, Tennessee, Missouri, Maryland, Alabama, Delaware, Indiana, Iowa, Kansas, Kentucky, Pennsylvania and Virginia. The provisions of the several state laws with reference to the amount of required deposits vary. For example, under the law of Wisconsin it is provided in effect that debtor's outstanding contracts in that state may not exceed 90% of the value of the deposit required to be maintained in that state; while Maryland requires deposits in an amount at least

equal to contract liabilities with a minimum of $25,000, and Illinois requires the same with a minimum of $50,000. Virginia requires a deposit of $25,000, without regard to the amount of cash liabilities, of which debtor has outstanding in Virginia approximately $550,000. The deposit provision of the Illinois law was enacted in 1931. Prior to that time no deposit was required in Illinois; but the debtor had sold its contracts in that state and had substantial cash liabilities outstanding there. Consequently the deposits made by the debtor with the State of Illinois never equalled the total cash liabilities in that state. Deposits of securities were made by the debtor with the Treasurer of the State of West Virginia to the total value, as of June 6, 1941, of more than $10,000,-000 on a market value basis, approximately $12,000,000 on a "sound" value basis, and about $14,000,000 on the basis of "book" value. At that time the total cash liabilities of the debtor to West Virginia contract holders were approximately $2,000,000. The excess above that figure, by the provisions of the West Virginia deposit statute, was for the protection of contract holders in states which required no deposit, as well as in states where the deposit was less than the total cash liabilities.

In each of the contracts sold by the debtor there was a provision, which is set out in the respective contracts as Section 1 thereof, whereby, with slight variation in language as to each particular class or series of contracts, the debtor agreed to create and maintain a reserve fund for such particular class or series from payments made on contracts of that particular class or series, which reserve fund was to be used for the discharge of its liabilities on that particular class or series of contracts. On its books debtor kept these various series funds separate and distinct, but prior to December 31, 1938, it deposited cash received from payments on all the different series of contracts except Series "B" and Series "D" in one bank account. Payments on contracts in Series "B" and Series "D" were deposited in separate bank accounts from their inception. At times when the reserve fund in one series was impaired by reason of withdrawals and maturities, so called "interfund" loans were made, of which exact records were kept and on which interest was charged to the borrowing fund and paid to the lending fund. In making the deposits with the

various state depositaries, debtor did not at all times designate deposited securities as being owned by particular funds, and made no attempt to proportion its deposits of securities from a particular fund to the amount of cash liabilities against that fund in the state where the securities were deposited. It is contended by some of the parties to this proceeding that as a result of this method of doing business, each of the separate series funds is a trust fund for the benefit of the holders of contracts in that particular class or series, regardless of the provisions of the various state deposit laws, which might otherwise be applicable. A decision on this point is not necessary to a determination of the issues now being considered by the court, but the facts are set out, inasmuch as they were developed at the hearing.

In the period following the year 1929 occurred a great financial depression. The market value of securities fell substantially and debtor's affairs became precarious, to say the least. When Auditor Sims took office in the year 1933 the entire assets of the company on a basis of market values were worth about $7,000,000 less than the amount of its cash liabilities. Gradually, by reason of an investment policy which took advantage of market fluctuations in certain securities, together with a general improvement in market values, the debtor's financial condition improved. At the time the petition was filed the market value of the debtor's assets was approximately $2,500,000 less than its cash liabilities.

On December 14, 1938, the Securities and Exchange Commission instituted an action against the debtor in the District Court of the United States for the Eastern District of Michigan, Southern Division at Detroit, as a result of which, and by consent of the debtor in open court, an injunction was entered against the debtor and its principal officers enjoining certain practices in which the debtor and its agents had theretofore engaged in connection with the sale of its investment contracts. Thereafter, and chiefly as a result of the Detroit proceedings, certain contract holders brought suit in the United States District Court for the Northern District of West Virginia, praying for the appointment of a receiver for debtor's property and assets on the theory that debtor was at that time insolvent. The court adopted the view that "sound" values instead of market values should be used as a basis of appraising debtor's solvency and held that

debtor on that basis was not insolvent, dismissing the proceeding. The Circuit Court of Appeals affirmed the District Court's decision. The publicity which resulted from the injunction and the litigation in the Northern District of West Virginia caused a substantial loss of public confidence and was greatly detrimental to debtor's business. However, debtor continued to operate until the passage of the Investment Company Act in the fall of 1940, 15 U.S.C.A. § 80a—1 et seq., when it became apparent that debtor could not continue to do business as in the past because it would be unable to comply with the conditions and provisions of that Act.

In this situation debtor attempted to devise means of continuing its business on a reorganized basis. Its officers and directors conceived the idea that it might be converted into an insurance company, retaining at the same time the power and right to issue annuity contracts as it had theretofore done, and that by a combination of life insurance features with the investment contracts, or by conversion of the contracts into life insurance policies or into annuities, debtor might be able to continue to do business. Accordingly the charter was amended as of December 31, 1940, so as to provide that the corporate objects and purposes thereafter were "to issue insurance upon the lives of persons and every insurance appertaining thereto and connected therewith and to grant, purchase and dispose of annuities." Auditor Sims issued a license to the debtor as so reorganized, but required of the debtor that it do no soliciting by virtue of this license; so that the only business transacted by the debtor after December 31, 1940, was the receiving of installment payments on contracts theretofore sold, paying off matured contracts and contracts presented for payment of their cash value, making loans on contracts and receiving payments thereon, and dealing with and managing the securities in its portfolio.

On April 4, 1941, Auditor Sims directed the debtor to cease doing business of any kind and to "freeze" its assets as of that date; that is, debtor would continue to receive payments being sent in by purchasers of contracts, but it was ordered by Sims to segregate these payments and to apply none of them towards improvement of the contracts, neither was it permitted to make any further payments on matured contracts or upon any contract surrendered by a purchaser for its cash value, nor to

make any further contract loans, nor to dispose of any securities held by the debtor. One week later, on April 11, 1941, Auditor Sims, as Commissioner of Insurance, filed a bill in the Circuit Court of Kanawha County, West Virginia, pursuant to the provisions of Section 45, Article 2, Chapter 33 of the Code of West Virginia, as added by Laws 1933, 1st Ex.Sess. c. 32, which section provides that such action may be taken by the Insurance Commissioner "for the purpose of taking possession of its [any insolvent investment company's] property in this state and the distribution of its assets among those entitled thereto according to their respective right." The Circuit Court of Kanawha County appointed Ross B. Thomas and H. Isaiah Smith as special receivers of the property and assets of the debtor in West Virginia. These receivers took into their possession all tangible property of the debtor in West Virginia and all its intangible property in West Virginia, except the securities which had been deposited by the debtor with the State Treasurer under the provisions of Section 3 of Article 9, Chapter 33 of the Code of West Virginia, already referred to. The securities in the hands of the State Treasurer had a market value at that time of approximately $10,000,000 and constituted more than 50% in market value of the total security deposits maintained by the debtor in all states requiring deposits, and almost 50% of all assets of the debtor.

After the appointment of the receivers by the Circuit Court of Kanawha County, West Virginia, most of the other states wherein the debtor maintained deposits under the provisions of the applicable state laws began proceedings looking toward the liquidation of the deposits in those states. For the most part, these proceedings took the form of the appointment of receivers by the respective state courts under statutes similar in purpose to the West Virginia statute under which Auditor Sims had acted. No securities were actually sold, except in the State of Wisconsin, where the Banking Commission, acting under the authority of a Circuit Court order, sold approximately $1,250,000 of securities which had been deposited by the debtor in that state, being about one-half the total deposit in Wisconsin.

At the annual stockholders' meeting of the debtor in February, 1941, fourteen directors were elected, but six of these had declined to serve. On June 3, 1941, a pur-ported meeting of the directors was held in Pittsburgh, Pennsylvania, at which meeting six of the eight directors who had been elected and who had consented to serve were present. They were Allen G. Messick, John Marshall, John Marshall, Jr., A. L. King, Howard E. Reed and F. H. Pulfer. D. A. Burt and F. s. Risley, the other two of the eight directors who had consented to serve, were not present. The by-laws of the debtor provide that seven directors shall constitute a quorum, and further that "vacancies in the board of directors not caused by removal by stockholders in general meetings may be filled for the remainder of the term by vote of a majority of all of the directors in office * * *." James R. Fleming, a friend of John Marshall, Sr., was present when the six directors met in Pittsburgh, and these six directors proceeded to elect him as a seventh director for the purpose of establishing a quorum, he having announced his intention to resign from the board upon adjournment of that meeting. At this meeting in Pittsburgh a resolution was passed authorizing John Marshall, Jr., on behalf of the company to file the petition for corporate reorganization under Chapter X, which is the basis of this proceeding. The petition was filed by Fleming as attorney for the debtor. The controverting answers filed challenge the validity of the Pittsburgh directors' meeting on the ground that a quorum was not present and on the further ground that several of the directors who were present were ineligible to serve as such, because of the fact that they had been enjoined in the Detroit proceeding. The Investment Company Act of 1940 provides, U.S.C.A. Title 15, § 80a—9, that it shall be unlawful for any person to serve as a director of a company who "by reason of any misconduct, is permanently or temporarily enjoined by order, judgment, or decree of any court," etc., from acting in various capacities in connection with the business of an investment company.

The validity of the directors' meeting of June 3, 1941, having been questioned, a subsequent directors' meeting was held on September 17, 1941, at which directors' meeting the minutes show the presence at the beginning of seven directors, namely, Allen G. Messick, John Marshall, John Marshall, Jr., Howard E. Reed, F. H. Pulfer, D. A. Burt and Wheeler Bachman. These directors elected Phil D. Paull to fill the place of A. L. King, resigned, and ratified and confirmed the action taken on

June 3, 1941, authorizing the filing of the petition. The validity of this meeting is likewise questioned, both because Wheeler Bachman was present and acted as one of the seven directors to make a quorum, he having previously in a letter to the debtor declined to act as a director, but no action having been taken thereon by the company, and because certain others of the directors are alleged to be disqualified by the aforesaid provisions of the Investment Company Act of 1940.

A third effort was made by the debtor to validate the original action of the board on June 3, 1941, with reference to filing the petition. A meeting of stockholders was held on October 3, 1941. At this meeting a resolution was adopted by the stockholders ratifying the filing of the petition; vacancies in the offices of directors were filled; the by-laws were amended to provide for a quorum of five instead of seven; and a directors' meeting was thereupon held, at which thirteen members of the board as then constituted were present; and a similar resolution of ratification was unanimously adopted. Those present were: Allen G. Messick, F. H. Pulfer, John Marshall, John Marshall, Jr., D. A. Burt, Philip D. Paull, James Paull, F. s. Risley, W. L. Burt, Gordon Hobstetter, George Miller, H. Julian Ulrich, and H. C. Hazlett. Seven of the directors present at this last meeting were not affected by the provisions of the Investment Company Act of 1940 already referred to. Opponents of the petition object to the validity of the last-mentioned stockholders' and directors' meetings on the ground that John Marshall, Sr., was permitted to vote the majority of the stock of the company at the stockholders' meeting, pursuant to a voting trust agreement which was originally entered into in connection with some refinancing efforts made by the company which failed of their purpose; and it is contended that the owners of the stock should have been permitted to vote it at the stockholders' meeting. Objection is also made that the court abused its discretion in consenting, prior to the meeting of stockholders and directors, that certain persons should be elected as officers of the company who, it is alleged, are still subject to disqualification, because of the Detroit injunction.

Shortly after the petition was filed, the trustee petitioned the court for authority to employ Allen G. Messick and James R. Fleming to assist the trustee in certain matters in which interested persons might be employed under the provisions of Chapter X. The court at first authorized such employment, but later, being of opinion that it would not be for the best interests of all parties concerned, revoked such authority and Messick and Fleming were never actually employed by the trustee. Opponents of the petition contend that the acts of John Marshall, Sr., Allen G. Messick and James R. Fleming, all of whom participated in the directors' meeting of June 3, 1941, which authorized the filing of the petition, together with other circumstances developed at the hearing, show a lack of good faith independently of the statutory standards set out in Section 146 of Chapter X.

The arguments, therefore, which are advanced by opponents of the petition are, first, that the debtor is an insurance company and therefore ineligible to file a petition for reorganization under Chapter X; secondly, that no valid authority was given for the filing of such petition; thirdly, that the securities in the hands of the State Treasurer of West Virginia, amounting to approximately ten million dollars in market value, are not assets of the debtor within the meaning of the venue provision of Chapter X and that since no other assets of the debtor are within the territorial jurisdiction of this court, this was not the proper venue for the filing of the petition; and, fourthly, that the petition of the debtor was not filed in good faith, either within the ordinarily accepted meaning of the term, or within the restrictions set out in Section 146 of Chapter X; and that under the provisions of Section 146 it is unreasonable to expect that a plan of reorganization can be effected; and that the prior proceeding in the Circuit Court of Kanawha County, West Virginia, would best subserve the interests of creditors and stockholders. It is further contended as bearing on the unreasonableness of any expectation that a plan of reorganization can be effected, that even though this court should be held to have both jurisdiction and venue of the proceeding as such, still it would lack authority by reason of the 10th and 11th amendments to the constitution of the United States to enter any order against any of the state depositaries having in their possession securities deposited by the debtor, as well as against the Kanawha County Circuit Court re-

ceivers, who, it is alleged, are merely agents of Auditor Sims; and further that the deposits made by the debtor with various state depositaries constitute contracts in the public authority which the court may not reject or interfere with; and that lacking such authority the court could not possibly provide for the carrying out of any effective plan of reorganization. I will now proceed to examine these arguments.

### Conclusions of Law.

### Is the debtor an insurance company?

■■ It is contended by opponents of the petition that even prior to December 31, 1940, the nature of the debtor's business was such that it should be denominated an insurance corporation within the meaning of Section 4 of Chapter III of the Bankruptcy Act, 11 U.S.C.A. § 22, which is also applicable to Chapter X; and further, that upon amendment of its charter on December 31, 1940, it became an insurance company, both in name and in fact, and was therefore ineligible to file a petition for reorganization under Chapter X. I am of opinion that prior to the charter amendment of December 31, 1940, debtor's business had none of the distinguishing features which characterize an insurance company. Originally it was organized as a brokerage company to deal as a broker in securities, real estate and insurance. When its charter was first amended in November, 1912, it was for the purpose of enabling it, as stated in the charter amendment, to engage in "the business of soliciting and receiving deposits and payments on any annuity contracts, certificates or annuity bonds." The contracts which it sold throughout its subsequent existence until it ceased selling any contracts whatever were not insurance annuity contracts. They were investment annuity contracts. An essential element of any insurance contract is that the insurer, as one of the conditions of the contract and as consideration, at least in part, for the periodical payment of premiums, assumes some risk of being required to pay the beneficiary a larger sum of money than the amount, with interest, paid in. In life insurance this risk takes the form of an agreement to pay a sum of money, contingent upon the death of the person insured; in accident insurance, upon the happening of an accident to the person insured; in title insurance, upon suffering of a loss by the person insured from defective title; in marine insurance, upon loss of an insured cargo, etc. Howard Fire Insurance Company v. Chase, 72 U.S. 509, 5 Wall. 509, 18 L.Ed. 524; Ogilvie v. Knox Insurance Company, 63 U.S. 380, 22 How. 380, 16 L.Ed. 349. In none of debtor's contracts did debtor assume any such risk, or, in fact, any risk. Even in the Series B contracts with the insurance provisions, it is quite clear that debtor itself assumed no risk, but merely agreed to keep those contracts insured as to unpaid installments, which it did by procuring an insurance policy from the Lincoln National Life Insurance Company. Clearly, debtor was an investment company and not an insurance company prior to December 31, 1940.

■ By the charter amendment of December 31, 1940, debtor became empowered (subject to the licensing authority of the State of West Virginia) both to issue life insurance contracts and to grant, purchase and dispose of annuities. In view of the fact that this charter amendment was a step in an attempted reorganization of debtor's business and that it had outstanding at that time many thousands of the investment annuity contracts described in its first charter amendment as "annuity contracts, certificates or annuity bonds," I am of opinion that the term "annuities" as used in the 1940 charter amendment referred to the same kind of investment annuity contracts which were then outstanding. In order that debtor might entertain any reasonable hope of reorganization, it was necessary that it continue to enjoy the power to "purchase and dispose of annuities", whether such annuities were to be those already outstanding or annuities afterwards sold. True, debtor's directors had decided that it could not continue business in the same manner as in the past, because it could not qualify under the Investment Company Act of 1940; but they hoped that by a combination of its business in investment annuity contracts with a life insurance business, the company might continue to operate. The precise plan of operation had not been determined upon at the time the debtor was placed in receivership in the Circuit Court of Kanawha County, West Virginia, on April 11, 1941.

■ In deciding whether a corporation is to be classified as an insurance or banking corporation or a building and loan association within the meaning of the Bankruptcy Act, the court must first examine the

provisions of its corporate charter. If the charter authorizes the company to engage in business in any of the excepted fields, and if the company in fact engages principally in a business which lies within that field, such a corporation must be treated as one excluded from the benefits of Chapter X. However, if its charter authorizes the corporation to engage in activities outside the excepted fields, and if all the business actually done by the corporation is outside those fields, then it must be treated as not being within any of the excluded classes. By this test debtor must be classified as a corporation which is not an insurance corporation within the meaning of the exemption provisions of the Bankruptcy Act. It is a corporation which is entitled to the benefits of Chapter X, and it had the right to file a petition for corporate reorganization. In re Supreme Lodge of Masons Annuity, D.C., 286 F. 180; In re Wisconsin Co-operative Milk Pool, D.C., 35 F.Supp. 787; In re Prudence Company, 2 Cir., 1935, 79 F.2d 77; Finletter, The Law of Bankruptcy Reorganization (1939) p. 107; Capitol Endowment Co. v. Kroeger, 6 Cir., 1936, 86 F.2d 976, 979.

Was the petition which debtor filed on June 6, 1941, properly authorized?

█ The directors' meeting in Pittsburgh, held on June 3, 1941, at which meeting John Marshall, Jr., was authorized by resolution to file the petition for corporate reorganization, was attended by only six directors. The by-laws of the debtor specify that seven directors are required to constitute a quorum. Eight of the directors elected at the annual meeting had consented to serve. It is clear that the directors' meeting in Pittsburgh was held without a quorum. The fact that the six directors who were present elected a seventh to complete the quorum does not change the situation. If a valid meeting could be held by six directors, there is no reason why it could not be held by any other number less than a quorum. Such procedure, if given the sanction of the court, would render nugatory the provision of the by-laws with reference to a quorum. The purported directors' meeting of June 3, 1941, was not a legal meeting and the directors could not at that meeting grant any valid authority to any person to file the petition for reorganization. Lawrence et al. v. Montgomery Gas Company, 88 W.Va. 352, 106 S.E. 890. Unless it can be said that the defective proceedings and the act of Marshall pursuant thereto in filing the petition were afterwards properly ratified by the debtor, they established no basis for this proceeding.

█ On September 17, 1941, another directors' meeting was held in Charleston, West Virginia, at which meeting were present seven of the persons who had been elected as directors of the debtor at the annual meeting held in February, 1941. One of these persons, namely Wheeler Bachman, had previously written a letter to the corporation declining to serve as a director, but no action had been taken thereon by the corporation. It is an elementary principle of law that one who resigns an office may recall or revoke his resignation at any time before it is accepted. It is not shown that Bachman ever formally resigned; but if we treat his letter as a resignation, his attendance at the directors' meeting of September 17, 1941, and his participation therein are sufficient evidence of his intention to revoke such resignation. He had the right to claim his office as director, at least when no other director objected, and his acts as such were valid. One objection to the validity of the directors' meeting of September 17, 1941, as well as to that of the prior meeting of June 3, 1941, is that certain of the directors were disqualified because the injunction which had been granted against them in December, 1938, was still in effect, and because the Investment Company Act of 1940 makes it unlawful for any person to serve as a director of a company who "by reason of any misconduct" is enjoined from acting in certain capacities covered by the 1938 injunction. I am of opinion that the fact that certain of these directors may have violated the law in serving as such directors would not render their acts as directors invalid. Moreover, all of the directors who were enjoined had filed applications for exemption with the Securities and Exchange Commission, as provided for in the Investment Company Act of 1940; and while exemptions had not been granted, neither had they been denied, and these persons had been serving as officers and directors of the debtor with the knowledge of the Securities and Exchange Commission and without objection. There could have been no valid action on the part of the directors of the debtor without the participation of at least some of these allegedly disqualified persons, since their exclusion from participation would have reduced the number of directors below the number necessary for a quorum. I am of

opinion that the directors' meeting of September 17, 1941, was valid. In view of that conclusion, it is unnecessary to consider the question of the validity of the meeting of stockholders and directors subsequently held on October 3, 1941; but I may properly say in passing that the October 3d meetings were in all respects legal. Any act which directors have power to do may be subsequently ratified, if performed in the first instance without authority. Helvering v. J. L. Brandeis & Sons, 8 Cir., 1935, 75 F.2d 487. It follows that the filing of the petition for corporate reorganization, though originally not properly authorized, was afterwards duly ratified, and such ratification was effective as of the date of the original act of authorization.

Is the Southern District of West Virginia the proper territorial jurisdiction for the filing of debtor's petition for corporate reorganization?

Section 128 of Chapter X of the Bankruptcy Act provides that an "original petition may be filed with the court in whose territorial jurisdiction the corporation has had its principal place of business or its principal assets for the preceding six months or for a longer portion of the preceding six months than in any other jurisdiction." The principal place of business of the debtor is located in Wheeling, a city in the Northern District of West Virginia. Therefore, unless it can be said that the debtor had its principal assets in the territorial jurisdiction of the Southern District of West Virginia for a longer portion of the six months next preceding June 6, 1941, than in any other jurisdiction, the petition must be dismissed.

It is undisputed that the securities in the hands of the Treasurer of the State of West Virginia at Charleston, in the Southern District, are of greater value than the securities deposited by debtor in any or all other states. It is likewise undisputed that virtually all of debtor's "free" assets, that is, tangible real and personal property and securities not in the hands of any state depositary, were located in the Northern District of West Virginia during the greater portion of the six months preceding June 6, 1941. The only question to be decided, then, in so far as this phase of the inquiry goes, is whether or not the securities in the hands of the Treasurer of the State of West Virginia are assets of the debtor within the meaning of Section 128 of Chapter X.

It is contended by opponents of the petition that the doctrine of mobilia sequuntur personam is applicable to the securities in the hands of the State Treasurer, and that since debtor has its principal office in the Northern District of West Virginia, these securities, being intangibles, have their legal situs in the same place. The doctrine of mobilia sequuntur personam is a legal fiction. Like all such fictions, it originated from necessity. Its use is limited to those cases in which it is necessary that the doctrine be invoked in order to accomplish some beneficial result and in which, without means of the doctrine, some proper governmental, legal or equitable principle would fail of application. In the absence of such necessity the situs depends upon power of control. The securities in the hands of the State Treasurer are chiefly bonds and certificates of stock. These documents are themselves chattels. Possession thereof gives the court within whose territorial jurisdiction the possession is held power of control over the debt or property right represented by them. In re Berthoud, D.C.S.D.N.Y., 1916, 231 F. 529; 1 Gerdes, Corporate Reorganization, Section 69.

In addition to the contention that the situs of debtor's intangible property is in the Northern District of West Virginia, it is further argued by opponents of the petition that the securities deposited with the State Treasurer at Charleston are not assets of the debtor at all. They say that when these securities were deposited, the State of West Virginia became vested with the legal title thereto, and that when Auditor Sims determined on April 4, 1941, that the debtor was insolvent, or, at the latest when the receivers were appointed by the Circuit Court of Kanawha County, West Virginia, the entire beneficial interest in these securities became vested in the holders of contracts secured thereby and that thereafter the debtor had no interest of any nature in the securities. I find no provision in any of the pertinent West Virginia statutes which gives to the State Auditor (Insurance Commissioner) or to the State of West Virginia itself any further interest in the deposited securities than that (1) if the Insurance Commissioner shall be of opinion that the assets of the depositing company are impaired or that it is not complying with the law, he is given authority to revoke its license and to retain the deposits under his authority and control until the total liabilities of the

company in the State of West Virginia are redeemed or settled and (2) if the company shall become insolvent, the Commissioner of Insurance is authorized to file a bill in the Circuit Court of Kanawha County for the administering of its assets and the distribution thereof among those entitled thereto according to their respective right. The language used in the applicable statutes, Code of West Virginia, Chapter 33, Article 9, Section 10, Michie, Section 3455; Chapter 33, Article 2, Section 45, Michie, Section 3325(1), indicates that the legislature intended the deposited securities to be deemed and treated as assets of the company; for in referring to impairment of *assets* and administering of *assets,* it is clear that the legislature meant to include the deposited securities, since under the law these at all times constituted the bulk of the property liable for the company's debts. The mere bringing of a suit and the appointment of receivers do not divest an insolvent corporation of its interest in property which up to that time it owned. The corporation still has an interest in the property to see that it is properly applied in satisfaction of its obligations; and it has the further right to receive whatever portion of the property may remain after all the obligations are satisfied. Such right is not affected by the fact that at the time receivership proceedings were instituted the corporation was insolvent. It is always possible that between the date of the appointment of receivers and the date of the court's final decree of distribution a change in values may produce a surplus over and above the claims of creditors. Auditor Sims testified that the market value of debtor's securities increased nearly five million dollars between 1933 and 1941, due in part to rising markets; and it is shown by other testimony that the market value of the securities increased substantially between the date the state receivers were appointed and the date of the hearing. It is also possible, and perhaps probable, in this case, since there are approximately 80,000 creditors, that their proved claims may amount to a total sum substantially less than that shown by debtor's books of account.

 The fact that stockholders of the debtor had no interest in the assets is immaterial. The test is whether or not the assets may be applied in payment of the debtor's obligations. In re Central Funding Corporation, 2 Cir., 1935, 75 F.2d 256; In re Mortgage Securities Corporation, 2 Cir., 1935, 75 F.2d 261.

The securities deposited with the Treasurer of the State of West Virginia are liable for the payment of debtor's obligations. Clearly they are assets of the debtor within the meaning of Section 128 of Chapter X.

 Was the petition filed in good faith?

Section 146 of Chapter X of the Bankruptcy Act provides that a petition shall be deemed not to be filed in good faith if "(1) the petitioning creditors have acquired their claims for the purpose of filing the petition; or (2) adequate relief would be obtainable by a debtor's petition under the provisions of chapter 11 of this Act [title]; or (3) it is unreasonable to expect that a plan of reorganization can be effected; or (4) a prior proceeding is pending in any court and it appears that the interests of creditors and stockholders would be best subserved in such prior proceeding." Subsections (1) and (2) are not applicable. The greater part of the voluminous testimony taken in the hearing was in relation to Subsection (3). The principal contentions of opponents of the petition are: that the Fidelity plan is fundamentally unsound; that its past history shows that it cannot be operated profitably; that the Investment Company Act of 1940 has made it impossible to operate the Fidelity plan in the future; that the unfavorable publicity which has attended Fidelity's operations during the past three years, including that incident to the present litigation, has created among Fidelity's contract holders a feeling unfavorable to any future operation of the company; and that the various states, if deprived of their asserted right of control over the deposits made therein, respectively, would not be friendly to future operations in those states. I will consider these contentions in the order stated.

The proceedings are not yet at a stage where the court is called upon to consider any particular plan of reorganization. It is true that the broad picture developed by the testimony at the hearing does not present a very favorable view with respect to the rehabilitation and continued operation of the debtor as a face amount certificate company. Whether the Fidelity plan is fundamentally unsound depends upon the definition given to that term. It is apparent that it is a plan of investment which

yields a very low rate of income to the investor and subjects the investor to substantial loss should he cease to pay the required installments during the earlier stages of the contract; but this very element of weakness from the investor's standpoint strengthens the company from an operating viewpoint, provided the contracts can be sold in sufficient volume to take care of necessary overhead expenses. It is extremely doubtful whether, in view of unsettled economic conditions and the critical international situation, the Fidelity plan would any longer appeal to a large public; but it is not impossible; and it is not the duty of the court to decide for the public that investors will not or should not buy these contracts in the future.

The fact that the company has not been operated profitably in the past is not shown to be the result of financial unsoundness in the plan itself. It has been due rather to an unsoundness in debtor's methods of management. Extravagant sales and promotion expenses; useless expenditures for lavish offices, including the home office building at Wheeling, West Virginia; overexpansion, particularly in states like Wisconsin, where the strictness of regulatory state laws made it impossible to operate at a profit; poor judgment in selection of the personnel to manage the company: these are the elements of unsoundness which have brought about the difficulties in which debtor now finds itself.

The requirements of the Investment Company Act of 1940, establishing 7% of the total amounts paid in on contracts during their entire life as the maximum loading charge, are calculated to make the contracts more saleable, and, with proper economy and good judgment on the part of the management, a reasonable profit to the operating company is possible. This regulatory law has not had the effect of banishing all such companies from the region of commercial operation. The testimony discloses that at least one other such company is still in operation, presumably with some measure of success.

To conclude that unfavorable publicity concerning the affairs of any company must affect that company's prospects of future operation after being reorganized under Chapter X is to lose sight of the very purpose of such a reorganization. All the unfavorable publicity has been directed towards the unreorganized company. What I have said above concerning the reasons for the company's present financial condition indicates that in my opinion such unfavorable publicity has been amply justified; but it does not follow that if and when the company may be reorganized under the supervision of a United States Court it would retain any of the stigmata which it is the purpose of such reorganization to remove.

■ As to the argument that the several states where debtor has sold contracts would be unfriendly to future operations of a reorganized company therein, it is sufficient to say that this argument imputes to the governments of those states unworthy motives for future action—motives which no court should assume would be entertained. Certainly if any reorganized company should seek permission to do business in those states, it would be required to comply with the state laws. It could do no less. It should not be expected to do more.

■ The debtor is insolvent, on the basis of market values, to the extent of approximately 10%; that is, its liabilities exceed its assets by that figure. This fact furnishes no basis for concluding that it is unreasonable to expect that a plan of reorganization can be effected. One of the essential allegations in a petition for reorganization is "that the corporation is insolvent or unable to pay its debts as they mature." Section 130, Chapter X, Bankruptcy Act. The stockholders may be entirely excluded from the reorganization. Case v. Los Angeles Lumber Products Company, 308 U.S. 106, 60 S.Ct. 1, 84 L. Ed. 110.

■ It is not necessary that there be a reasonable prospect for the successful rehabilitation of the debtor as a going or continuing corporation. It is sufficient if it is shown that the debtor is in a position to conform to and obtain the benefits of the statute for a slow, beneficial and orderly liquidation. R. L. Witters Associates, Inc., v. Ebsary Gypsum Co., Inc., et al., 5 Cir., 1938, 93 F.2d 746; In re Central Funding Corporation, 2 Cir., 1935, 75 F.2d 256; In re Mortgage Securities Corporation, 2 Cir., 1935, 75 F.2d 261. The character of debtor's assets is such that it would be peculiarly beneficial in its case to obtain slow and orderly liquidation, if such should be found to be the only feasible plan. The dumping upon the market of twenty million dollars worth of securities of the kind held in debtor's portfolio would most certainly result in substantial

losses, which may be avoided by slow and careful liquidation over an extended period of time. The possibility must also be considered that some of the debtor's outstanding contracts may be found to be secured to the extent of their full cash value, while others may be found to have less security, and therefore it may be practicable to liquidate the different contracts in different ways and by different methods, or to liquidate some and to effect a continuing reorganization as to others.

The argument that the receivership proceeding pending in the Circuit Court of Kanawha County is one in which the interests of creditors and stockholders would be best subserved, was vigorously urged. Its fallacy is patent. I shall, however, devote some space to its consideration. To say that a court which has jurisdiction only within the bounds of the State of West Virginia could properly deal with assets located in twenty-nine different states is, in my opinion, absurd. Even as to the assets in West Virginia, it is contended by Auditor Sims that the receivers appointed by the Circuit Court of Kanawha County are merely his agents, and that the only assets really under their independent control are a few hundred thousand dollars in value of free securities, real estate and tangible personal property. I am further impressed by the fact that whereas the total securities deposited in West Virginia are valued in the market at approximately ten million dollars, the total outstanding contracts in West Virginia represent only approximately two-million dollars in cash liabilities. If administration of these securities were left in the control of the West Virginia state court or of the State Auditor, an inequitable situation would result. The state court or State Auditor would be vested with power to administer eight million dollars worth of securities deposited in West Virginia to secure cash liabilities in other states where there is no law requiring deposits and where deposits do not equal liabilities, and at the same time would be without power or control over any of the deposits in those other states where deposits have been made and maintained.

There is another reason why the receivership proceeding in the Circuit Court of Kanawha County is not conducive to the best interests of creditors. One of the receivers appointed by that court is an attorney connected with the law firm of Koontz & Koontz. The firm of Koontz & Koontz represents the receivers, both in the Circuit Court of Kanawha County and in the litigation in this court. Arthur B. Koontz, senior partner in the firm of Koontz & Koontz, was for many years a director of the debtor, and as such was closely associated with its affairs and with the other members of its board of directors during his years of service as a director. It is not improbable that investigation into debtor's affairs may disclose the existence of liability from some or all of the directors to debtor's creditors. Is it reasonable to suppose that such liabilities, if any, would be diligently sought out and pursued in a proceeding with which one of debtor's directors is so closely associated? The question answers itself. I have no criticism of the action of the Circuit Court of Kanawha County in appointing the receivers who were appointed. Doubtless that court, not being bound by the prohibitions of Chapter X with reference to appointment of interested persons, acted as seemed best to that court under the pleadings and evidence presented to it. I must decide the questions presented here in the light of all the facts and circumstances in connection with the state court receivership, which circumstances I deem to be of some weight in deciding whether the best interests of creditors would be subserved in the prior proceeding. I am of opinion that they would not be best subserved.

■ It is further argued that under the general meaning of the term "good faith" the debtor did not in fact exercise good faith in filing the petition for corporate reorganization. By lack of good faith in proceedings such as this it is ordinarily meant that the petition, if filed by creditors, is filed for the purpose of harassing or embarrassing the debtor, and if filed by the debtor, is filed for the purpose of hindering, delaying or defrauding creditors. When subjected to this test, I can perceive no substantial basis for the contention that the petition was not filed in good faith. It was calculated to bring about a result which would not only not hinder, delay or defraud the creditors, but which would benefit them by removing the litigation from numerous state court proceedings, wherein debtor's assets might reasonably be expected to be largely dissipated in costs, fees, and market losses by forced liquidation, to a forum where, under the broad and salutary provisions of Chapter X of the Bankruptcy Act, its assets may be conserved and its financial structure reorganized and rehabilitated, if a feasible plan can be devised. The fact

988

that some stockholder or director may have been motivated by the hope that he might preserve for the future some connection with the affairs of the company is not in itself proof of bad faith. The evidence shows that the directors who participated in the proceedings to authorize the filing of the petition entertained the bona fide belief, at the time they voted in favor of the resolution authorizing the petition to be filed, that it was only by proceeding under Chapter X in a United States Court that debtor could reasonably hope to obtain any practical results by way of corporate reorganization.

I am satisfied that the petition complies with the requirements of Chapter X of the Bankruptcy Act, and has been filed in good faith.

Does the Eleventh Amendment to the Constitution of the United States limit the power of this court with reference to the securities deposited with the several state depositaries?

It is urged that in so far as the present proceeding requires the court to act with reference to securities deposited with state officials and now in their hands, it is to that extent a suit against the state and therefore within the prohibition of the Eleventh Amendment. It is further contended by Auditor Sims that the receivers appointed by the Circuit Court of Kanawha County are merely his agents and that therefore the same constitutional prohibition applies to a suit against them as he alleges with respect to the suit against him. I may dispose of the latter contention summarily by saying that I know of no principle of law or equity, nor has any such been cited to me, whereby an ordinary equity receiver appointed by a Circuit Court under a general statute can be treated in any other capacity than as an officer of the court appointing him. The fact that a statute of the State of West Virginia requires that before receivers of insolvent insurance (and perhaps, by implication, investment) companies may present their report to the court for confirmation, they must first submit it to the Insurance Commissioner, W. Va.Code, Chapter 33, Article 2, Section 36, Michie's Code of 1937, Section 3317, can have no bearing on the question of the receivers' status in this case. It is always necessary and essential that the court exercise its authority and discretion in acting upon receivers' reports, whether such reports are approved by the Insurance Commissioner or not.

In deciding the more substantial question of whether or not this phase of the proceeding should be deemed a suit against the states which hold deposits, I am impressed by the fact that here the state is only a nominal and not a real party in interest. As I have already pointed out in an earlier part of this opinion the assets deposited with the states remain assets of the debtor and the maximum extent of the interest of the states in those deposits is that they be held in custody until the liabilities of the debtor are redeemed or settled. Compliance with any decree which may be entered by this court in this proceeding will not require the doing of any affirmative act which affects the states' political or property rights. The result of this litigation will neither inure to the benefit of, nor impose any liability upon any state. The real parties in interest are the Fidelity contract holders and the debtor itself. It is with respect to the contract holders (the creditors) that any decree entered by this court will effectively operate. The general governmental interest of a state in the welfare of its citizens in compelling obedience to the orders of its officials and securing compliance with its laws is not such as to make it a party in interest in this litigation. Morrill v. American Reserve Bond Company, C.C.W.D.Mo., 1907, 151 F. 305; Porter v. Beha, 2 Cir., 1926, 12 F.2d 513; Hobbs v. Occidental Life Insurance Company, 10 Cir., 1937, 87 F.2d 380.

Is the order of this court with reference to securities in the hands of a state as a depositary violative of the Tenth Amendment to the Constitution of the United States?

It is argued that the state statutes regulating investment companies were enacted under the police power of the states and that in so far as Chapter X of the Bankruptcy Act purports to give to a Federal court the power to enter a decree in conflict with these state laws, it violates the Tenth Amendment and is therefore to that extent inoperative.

It is well settled that Chapter X providing for corporate reorganization is within the bankruptcy power granted to the Federal Government by the Constitution. For a time in recent years the question of whether the Tenth Amendment is a limitation upon the powers of Congress

was not clearly answered by the courts; but since the decision in United States v. Darby, 312 U.S. 100, 61 S.Ct. 451, 462, 85 L.Ed. 609, 132 A.L.R. 1430, there can be no doubt as to the answer. In that case the present Chief Justice said:

"Our conclusion is unaffected by the Tenth Amendment * * *. The amendment states but a truism that all is retained which has not been surrendered. There is nothing in the history of its adoption to suggest that it was more than declaratory of the relationship between the national and state governments as it had been established by the Constitution before the amendment or that its purpose was other than to allay fears that the new national government might seek to exercise powers not granted, and that the states might not be able to exercise fully their reserved powers * * *.

"From the beginning and for many years the amendment has been construed as not depriving the national government of authority to resort to all means for the exercise of a granted power which are appropriate and plainly adapted to the permitted end." See the Article "The Tenth Amendment Retires," in American Bar Association Journal, April, 1941.

▮ As I have already pointed out, the only respect in which the state statutes can be said to conflict with the Bankruptcy Act is that they give to state officials the right to retain custody of the deposits until final settlement or redemption of debtor's liabilities. If such provisions are in conflict with Chapter X of the Bankruptcy Act, a question which I do not deem it necessary to decide at this time, In re Bajardi, 2 Cir., 1926, 9 F.2d 797, the provisions of the Bankruptcy Act must be held to be "paramount to any state statute the effect of which may impair or emasculate them." In re Coney Island Hotel Corporation, D. C.E.D.N.Y., 1934, 9 F.Supp. 329; Everard's Breweries v. Day, 265 U.S. 545, 558, 44 S.Ct. 628, 68 L.Ed. 1174; United States v. Darby, supra.

▮ On the remaining question of whether the deposits made with state of-ficials are "contracts in the public authority," I think it is sufficient to say that in my opinion that phrase as used in Chapter X of the Bankruptcy Act has no application to the circumstances here presented. Moreover, this proceeding need involve no disaffirmance or rejection of any such contracts, if contracts they be. The deposits with the states are held subject to the order of a court of competent jurisdiction. Certainly this court as such will give effect to whatever contractual rights may exist. It will be time to object if and when this court shall enter any decree which may operate as a rejection of any so called "contracts in the public authority."

▮ The various state officials holding debtor's deposits, and a fortiori the receivers, are not adverse claimants. The argument to the contrary is unsubstantial and without merit. The deposits are held as security for the payment of claims of debtor's contract holders. Debtor has never been divested by any kind of foreclosure proceedings of its residual interest in the deposits. They are not adversely held. No plenary suit is required in dealing with them. The assertion of adverse claims, being merely assertion and no more, may be disposed of summarily, as I have done. Gamble v. Daniel, 8 Cir., 1930, 39 F.2d 447; In re Faour et al., 2 Cir., 1934, 72 F.2d 719; Hobbs v. Occidental Life Insurance Co., supra; Continental Illinois National Bank & Trust Co. v. Chicago, R. I. & P. R. Co., 1935, 294 U.S. 648, 55 S.Ct. 595, 79 L.Ed. 1110; Miles v. New South B. & L. Ass'n, C.C.N.D.Ga., 1899, 95 F. 919.

▮ The conclusion is that the motions for dissolution of the injunction "freezing" the deposits in the hands of state depositaries and for rescinding the orders directing state receivers to turn over to the trustee assets of the debtor in their hands are overruled and the debtor's petition for corporate reorganization filed on June 6, 1941, is approved.

An order may be entered in accordance with this opinion.