SIMS, Auditor of State of West Virginia, et al. v. FIDELITY ASSUR. ASS'N.

No. 4923.

Circuit Court of Appeals, Fourth Circuit.

June 16, 1942.

James Ward Rector, Deputy Atty. Gen., State of Wisconsin, Fyke Farmer, Rickard H. Lauritzen, Asst. Atty. Gen., State of Wisconsin, J. Campbell Palmer, III, of Charleston, W. Va., and H. Vernon Eney, of Baltimore, Md. (John E. Martin, Atty. Gen., State of Wisconsin, John M. Rankin, Atty. Gen., State of Iowa, Floyd Philbrick, First Asst. Atty. Gen., State of Iowa, Carl J. Stephens and Ben C. Buckingham, both of Des Moines, Iowa, Guy B. Brown, of Baltimore, Md., Rudolph K. Schurr, of St. Louis, Mo., Clarence W. Meadows, Atty. Gen. of West Virginia, and Ira J. Partlow, Asst. Atty. Gen. of West Virginia, on the brief), for appellants.

John V. Ray, of Charleston, W. Va., Justin N. Reinhardt, Atty., Securities and Exchange Commission, and Homer Kripke, Sp. Counsel, Securities and Exchange Commission, both of Washington, D. C., T. C. Townsend, of Charleston, W. Va., and Dorr E. Warner, of Cleveland, Ohio (James R. Fleming, of Fort Wayne, Ind., Townsend &

Townsend and Hillis Townsend, all of Charleston, W. Va., W. J. Thompson, of Charleston, W. Va., John T. Keenan, of Le Mars, Iowa, and Chester T. Lane, Gen. Counsel, Securities and Exchange Commission, of Washington, D. C., on the brief), for appellee.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

The appeal in this case is from an order of the District Court of January 5, 1942, whereby the court approved the petition of Fidelity Assurance Association, a West Virginia corporation, praying for reorganization under Chapter X of the National Bankruptcy Act, 11 U.S.C.A. § 501 et seq., and overruled certain motions to modify or rescind prior orders of the court with respect to the custody or control of securities deposited by the corporation with officials in fifteen states of the union. The appellants herein are intervenors in the bankruptcy proceeding, and include various state officials with whom the debtor had deposited securities, as required by state statutes, that is, the Auditor and Ex Officio Insurance Commissioner of West Virginia, the State Court Receivers in West Virginia, the Banking Commission of Wisconsin, the Commissioner of Insurance and Permanent Receiver for the debtor in the State of Iowa, the Insurance Commissioner of Maryland, the State Court Receiver in Missouri, and certain contract holders in Tennessee. Since the Fidelity is now insolvent and its business operations have been discontinued, the appellants seek to uphold the authority of the state officials to apply the deposits in their custody for the benefit of local contract holders in accordance with the applicable state laws. A number of objections to the action of the District Judge are raised, but in the view we take of the case, it will be sufficient to consider only two questions: (1) Whether the Fidelity was an insurance company when the petition in bankruptcy was filed, and as such, was exempt from the provisions of the Bankruptcy Act; (2) whether the petition was filed in good faith within the meaning of that term in Chapter X of the statute.

The Fidelity was incorporated on April 11, 1911, in West Virginia, under the name of the Fidelity Investment and Loan As-. sociation, to buy, sell and deal in stocks, bonds and real estate. By charter amendment in November, 1912, its name was changed to Fidelity Investment Association and it was authorized to receive payments on annuity contracts in fixed installments or otherwise, and to sell certificates, bonds or other investment securities of any kind on the installment or any other plan of payment. Its original authorized capital of $100,000 was increased to $200,000 in 1912, $500,000 in 1926, $1,000,000 in 1929 and $13,000,000 in 1931. The total outstanding stock on December 30, 1940 was $911,000 of preferred and $812,300 of common. Of the preferred, $505,100 had been paid for in cash in that it was issued in exchange for annuity contracts surrendered by the holders and $405,900 of preferred had been issued as dividends on the common stock. Of the common stock, $195,873.34 had been issued for cash and $616,426.66 had been issued as dividends on the common stock.

From November, 1912, to the end of 1940, the Fidelity was engaged in selling its own securities in the form of investment contracts variously known as annuities, installments or, more recently, face amount certificates, and in investing the funds received from the purchaser. This activity brought the corporation within the scope of Article 9 of Chapter 33 of the Code of West Virginia which required every person or corporation engaged in this business in the State to secure a license from the Insurance Commissioner of the State and to deposit with the State Treasurer, in trust for the benefit of the contract holders, securities approved by the Insurance Commissioner in the sum of $100,000; and in addition to maintain with the State Treasurer securities so approved equal in amount to the cash liabilities of the corporation under its contracts; provided that such additional deposits were not required to be made with respect to contracts sold in other states to the extent that the law of such states required deposits to be made therein for the benefit of local contract holders. Article 9 (5) of the West Virginia Code directed the Insurance Commissioner to revoke the license of any corporation failing to make the required deposits and to suspend the license of any corporation if he should find that its liabilities exceeded its assets; and Article 9 (10) of the Code gave the Insurance Com-

missioner the same authority over every corporation engaged in selling annuity contracts as over insurance companies, and empowered him, if he should be of the opinion that the assets of such a corporation were impaired, or that it was not complying with the law, to revoke its license; and if so, to retain authority and control over the deposits until the total liability of all the contracts issued by the corporation in the state should be redeemed or settled. Similar provisions are found in the statutes of fourteen other states in which the Fidelity sold annuity contracts and made the required deposits.[1] The Fidelity also sold annuity contracts in fourteen additional states in which no deposit was required by law. In short, the Fidelity sold contracts in twenty-nine states and deposited securities for the benefit of the purchasers in fifteen states. The market value of the securities deposited in each of the fifteen states as of June 6, 1941, when the pending suit was instituted, and the net cash liability of the Fidelity to the purchasers therein as of April 10, 1941, is shown by the following table:

| State | Deposit by States as of June 6, 1941 Market Value | Liabilities by States as of April 10, 1941 Net Cash |
|---|---|---|
| Alabama | $ 32,555.16 | $ 31,346.71 |
| Delaware | 293,790.63 | 290,175.36 |
| Illinois | 3,759,894.00 | 1,225,790.75 |
| Indiana | 162,863.44 | 386,173.45 |
| Iowa | 45,082.50 | 34,478.27 |
| Kansas | 83,337.50 | 108,784.89 |
| Kentucky | 86,712.50 | 92,690.42 |
| Maryland | 470,806.25 | 492,552.24 |
| Missouri | 861,100.62 | 786,988.86 |
| Ohio | 509,573.44 | 2,360,418.70 |
| Pennsylvania | 232,591.57 | 4,668,582.25 |
| Tennessee | 196,574.38 | 200,504.97 |
| Virginia | 27,703.13 | 557,809.19 |
| West Virginia | 10,674,696.08 | 6,896,393.88 |
| Wisconsin | 2,619,399.07 | 2,342,978.73 |
| | $20,056,680.27 | $23,475,668.67 |

In addition, the Fidelity had undeposited securities of the market value of $556,467.51 on June 6, 1941, and approximately $500,000 in cash.

---

| 1 State | Amount of Deposit and Legal Nature | Statute |
|---|---|---|
| Alabama | Amount set by Sec. Comm'r and held in escrow | Tit. 53, Sec. 12, Ala. Code 1940 |
| Delaware | $100,000, up to 100% if required "in trust" | Ch. 66, Sec. 105 (2362) Rev. Code Del. 1935 |
| Illinois | $50,000, 100% if required (100% was required) "for the benefit of Illinois contract holders" | Ch. 121½, Sec. 101a, Rev. Stats. 1941 |
| Iowa | 100% of liability "guaranteeing faithful performance" | Ch. 392, § 8521, Iowa Code 1939 |
| Indiana | $100,000 "for benefit and security of" all policy holders and creditors | Burns' Ann.St. § 39-4706. |
| Kansas | $50,000 limited to Bldg. & Loan Ass'n | Ch. 17, Art. 10, Sec. 17-1033, Kans. Stats. |
| Kentucky | 75% up to $100,000 of liability "for protection of contract holders" | Ch. 72-a, § 2223-a et seq., Carroll's Ky. Stats. 1936 |
| Maryland | $100,000 "in trust" | Art. 48A, Sec. 21 Ann.Code, 1939 |
| Missouri | 100% of liability | Rev. Stats. Mo. 1939 § 5502, Mo.R.S.A. § 5502 |
| Ohio | $100,000 "for the protection of investors" | Ch. 2b, Sec. 698, Page's Ohio Code, Ann. |
| Pennsylvania | $100,000 "as security for fulfillment of contracts" | Ch. 28, Tit. 7, § 784, Purdon's Pa.Stats. |
| Tennessee | $100,000 "for benefit of Tennessee creditors" | Section 6107(2), Michie's Tenn.Code 1938 |
| Virginia | At discretion of Sec. Comm'r up to 20% of sales price of securities to be sold. | Title 34A, Ch. 147A, § 3848(51) Va.Code 1936, Ann. |
| Wisconsin | $100,000 deposit maintained in trust for benefit of local members | Sec. 216.04, Wis. Stat. |

On April 10, 1941, 87,999 contracts were outstanding with a face amount of $181,948,026.70 and cash liability of $23,475,668.67. The contract holders reside in each of the forty-eight states, the District of Columbia and in foreign countries.

The Securities and Exchange Commission, pursuant to Section 30 of the Public Utility Holding Company Act of 1935, 15 U.S.C.A. 792—4, undertook an investigation of the business of companies issuing face amount installment certificates, and made a report to Congress on March 13, 1940, in which one chapter was devoted to the Fidelity Investment Association. Based on this report Congress passed the Investment Company Act of 1940, 54 Stat. 789, 15 U.S.C.A. 80a—1 et seq., effective January 1, 1941, wherein it found that investment companies are affected with a "national public interest"; and enacted strict regulations to govern the sale of face amount certificates, that is, certificates, investment contracts or other securities which represent an obligation of the issuer to pay a stated sum at a fixed date more than twenty-four months after the date of issuance, in consideration of the payment of periodic installments of a stated amount. Upon the passage of this Act,[2] it was immediately apparent that the Fidelity would be unable to comply with the regulations, especially as to the permissible sales load and the reserve to be maintained with respect to the issued contracts. To meet this situation, another change in the corporate charter was made on December 31, 1940 whereby its name became Fidelity Assurance Company, and its objects and purposes were stated to be "to issue insurance upon the lives of persons and every insurance appertaining thereto and connected therewith, and to grant, purchase and dispose of annuities."

On January 24, 1941, the charter was again changed so as to reduce the authorized capital to $1,000,000 of common stock of a par value of $8 per share. The resolution authorizing the change in the charter stated that it was the desire of the company to transact life insurance business outside the State of West Virginia, and that in order to accomplish this purpose, it was necessary that the stock of the company should be common stock of one class

and of such amount as would leave a surplus satisfactory to the insurance departments of the several states. 18,220 shares of the new stock were to be issued in exchange for 9,110 shares of the outstanding preferred stock, and 8,123 shares were to be issued in exchange for 8,123 shares of the outstanding common stock. No stock was in fact issued, cancelled or exchanged pursuant to this provision prior to the institution of the pending case.

During the greater part of the period covered by this corporate history, that is, from 1912 to 1940, the Fidelity was engaged in the sale of annuity contracts. These took several different forms, but they were similar in their essential provisions. The purchaser agreed to make monthly payments of a stated amount for the period of 120 to 132 months, and the Fidelity agreed to return to the purchaser, after the expiration of the period and of an additional waiting period from 3 to 13 months, a stated sum of money known as the face amount of the contract in monthly, quarterly or annual installments, in accordance with one of the optional plans of settlement selected by the purchaser under the terms of the contract. Each form of contract contained detailed provisions as to payments, cash surrender value, lapses and optional plans of settlement. The net return on the investment, if the contract was fully performed, varied from 1.55 to 3.09%. No surrender value was provided until 10 to 16 monthly payments had been made. If the contract lapsed during this period, all payments made by the purchaser were forfeited to the company. The surrender value did not equal the amount paid in until payments had been made from 6 to 9 years. The report of the Securities and Exchange Commission (p. 111) shows that during the 10 year period from 1927 to 1936, the lapsed contracts amounted to 91 to 93%, and the matured contracts to 7 to 9%, and that the contracts which matured during this period amounted to only 14% of those in force at the beginning of the period.

Three types of contracts were issued prior to 1921; another between 1921 and 1925, and a fifth between 1925 and 1932. During the last mentioned period the growth of the business was very rapid so

---

[2] Registration under this Act by companies doing business in the State was required by Ch. 46 of the Acts of West Virginia of March 8, 1941, effective 90 days thereafter, whereby Ch. 33, Art. 9, of the West Virginia Code was repealed. See W.Va.Code, Ch. 32, Art. 3.

that in 1932 the company had assets of $25,000,000. The sales of contracts were greatly aided throughout the company's history by the confidence inspired by the deposit of securities under the laws of West Virginia and other states, and the salesmen of the company made constant reference to the security thereby afforded investors. In 1934 the Series B contract was first issued, and thereafter until the end of 1940, when the company ceased the sale of annuities, almost all the contracts took this form. It contained an optional insurance feature for an additional charge whereby in the event of the death of the purchaser before the maturity of the contract, funds were provided wherewith the contract would be paid up to maturity or the commuted value of a paid-up contract would be paid to the purchaser's estate. Seventy-five per cent of the Series B contracts sold carried this feature, and a substantial number of the holders of the older contracts converted them into Series B contracts with insurance. The insurance was provided by a group insurance policy written by Lincoln National Life Insurance Company of Fort Wayne, Indiana. An older Series D contract was still sold in Ohio, Kentucky and Alabama, since these states would not permit the sale of the Series B contract with insurance unless the company qualified to do business as an insurance company. Following the issuance of the Series B contract, the sales of the company stepped up greatly. $16,-000,000 face amount certificates were sold in 1935, $25,000,000 in 1936, $40,000,000 in 1937 and $52,000,000 in 1938.

In December, 1938 the Securities and Exchange Commission filed a bill for injunction against the Fidelity in the District Court of the United States for the Eastern District of Michigan, alleging that certain practices of the company violated the fraud provisions of the Securities Act of 1933, 15 U.S.C.A. § 77a et seq.; and on December 22, 1938 a consent decree was entered whereby the Fidelity was enjoined inter alia from failing to meet the deposit requirements of the several states; from failing to maintain separate contract reserve funds or required reserves; from paying dividends except from earned surplus; and from obtaining money or property by making false or misleading statements. See S.E.C. Report 257. In the same month a suit for the appointment of receivers was brought by certain contract holders against the Fidelity in the Northern District of West Virginia based on the facts developed in the suit in Michigan; but the bill was dismissed in the District Court and this action was affirmed by this court on August 28, 1939 in Hutchinson v. Fidelity Inv. Ass'n, 4 Cir., 106 F.2d 431, 133 A.L.R. 1061, as it was shown that the company was not then insolvent when its assets were appraised in accordance with the "sound value formula" prescribed by the insurance Commissioner of West Virginia. These cases did not put an end to the company's activities, but they produced much unfavorable publicity and its business declined so rapidly in volume that in 1940 the total sales were less than $12,000,000 and by April 1941 the liabilities of the company exceeded the assets by $2,500,000.

The force of these circumstances and the requirements of the Federal Investment Company Act of 1940 led the Fidelity to secure the change in charter on December 30, 1940 so as to authorize it to conduct a life insurance business. The company also paid for and obtained a license from the Auditor and Ex Officio Insurance Commissioner of West Virginia to do a life insurance business in the state for the period ending March 31, 1941. Proposed forms of new annuity and life insurance policies were filed with the Insurance Commissioner of West Virginia pursuant to requirements of the state law as a condition precedent to the sale of such policies. An informal understanding or gentleman's agreement was reached with the Insurance Commissioner that the company would not sell insurance policies or annuity contracts until he gave it permission, but might continue to collect installments on the annuity contracts then in force. Application for a renewal of the license for the year beginning April 1, 1941 was made by the company in due course but the Commissioner withheld it and shortly thereafter directed the company to cease business.

In the meantime, however, the company had issued a substantial number of policies of insurance in the following manner, without requiring payment from the insured. At the meeting of the Board of Directors on December 31, 1941 it was determined that the Fidelity should agree to assume the insurance risks involved in the majority of the Series B contracts, and accordingly duplicate riders were sent to all of the holders of such contracts to the number of

14,626; and of these 9,802 signed riders and returned one to the company, whereby it assumed the obligations of the insurer, as set out in the contract. The company continued to pay the premiums on the group policy issued by the Lincoln National Life Insurance Company so as to continue it in force.

On April 4, 1941, the Auditor of West Virginia directed the Fidelity to discontinue business and to segregate payments thereafter made by contract holders. On April 11, 1941 he filed a bill in the Circuit Court of Kanawha County, West Virginia, pursuant to Chapter 33, Article 2, Section 45 of the State Code which provided that whenever any company under the supervision of the Insurance Commissioner should become insolvent, the auditor might file a suit and take possession of its property and distribute its assets amongst the persons entitled thereto. The Fidelity appeared in this suit but filed no objection and receivers were appointed by the court. They took possession of the cash and undeposited securities, but not the securities in the hands of the State Auditor. That official notified the proper officials in other states, and proceedings were instituted in Indiana, Ohio, Illinois, Tennessee, Kansas, Kentucky, Missouri, Pennsylvania, Iowa and Maryland. In Wisconsin, the Banking Commission promptly proceeded to administer the company's affairs, as provided by the state law, received claims from 6,000 local contract holders and realized the sum of $1,259,244.04 by the sale of deposited securities at prices in excess of the company's valuation of December 31, 1940.

On June 6, 1941, the Fidelity filed a petition in the instant case alleging insolvency and prayed for reorganization under Chapter X of the Bankruptcy Act, 11 U.S.C.A. § 501 et seq. On the same day the District Judge entered an ex parte order wherein the petition for reorganization was approved, a trustee for the debtor was appointed and the West Virginia receivers and other persons were enjoined from disposing of any of the debtor's property and the state receivers were directed to turn over all the property in their hands to the trustee. On June 10, 1941, by another ex parte order all state officials in West Virginia and in other states were directed to deliver to the trustee all property of the debtor in their hands. The West Virginia receivers turned over the property in their hands under protest and the Ohio receiver turned over to the trustee without protest the property of the debtor in his possession. The state officials generally retained possession of the deposits in their custody.

The auditor and the West Virginia receivers immediately appealed from these orders to this court. On August 9, 1941 the District Court modified the orders of June 6 and 10th by eliminating the turnover provisions, so that they merely enjoined the receivers and the Insurance Commissioners from selling or otherwise disposing of any of the assets of the debtor in their possession. Since the receivers and state officials of a large number of states were affected by the injunction order, but only those from West Virginia were parties to the appeal, and since a number of questions going to the jurisdiction were raised and the record was fragmentary, we declined to pass upon the questions involved and affirmed the interlocutory order without prejudice to the rights of the appellants or any other parties to the proceeding in the District Court with respect to any question there pending. See Sims v. Central Trust Co., 4 Cir., 123 F.2d 89. Subsequently the Insurance Commissioners and officials of other states and receivers appointed by state courts were permitted to intervene and file answers controverting the allegations of the petition. The Security and Exchange Commission intervened at the request of the court. After extended hearings, the order appealed from was filed.

We first consider the contention that the petition in bankruptcy should be dismissed because at the time it was filed in the District Court, the Fidelity was an "insurance corporation" within the meaning of Section 4 of the Bankruptcy Act, as amended by the Act of June 25, 1910, 36 Stat. 839, 11 U.S.C.A. § 22. Thereby municipal, railroad, insurance and banking corporations are excepted from the provisions and benefits of the Act. The District Judge held that the Fidelity was not an insurance company within this exception, and was therefore entitled to file a petition for reorganization under Chapter X of the statute. His view was that in determining such a question, the charter of the corporation must first be examined, and if it appears that it is authorized thereby to engage in the excepted field and actually conducts its principal business in that field, it is excluded from the purview of the Act; but if the charter also authorizes the corporation to

do business in other fields, and all of the business is done in these fields, then the corporation is not an insurance company and is entitled to file a petition in bankruptcy. Finding as a fact that the Fidelity had never issued any insurance contracts but had been engaged only in selling annuities, he concluded that it was not an insurance corporation.

■ It should be noted at this point that, for some reason that is not entirely clear, the attention of the District Judge was not called to the fact now admitted, that after the Fidelity amended its charter and secured a license on December 31, 1940, to engage in the business of life insurance in West Virginia, it issued 9,802 contracts of insurance prior to April 1, 1941, in the manner above described. Since it issued no other new contracts of any kind during this period, but merely supervised its old outstanding annuity contracts, it is by no means certain that it did not fall within the statutory exception even under the rule of law announced by the District Judge. But this question need not be decided now, for, in our opinion, the scope of the provision by which municipal, railroad, insurance and banking corporations are excepted from bankruptcy proceedings is to be determined in any case by the classification of the corporation under the law of the state of its creation rather than by the character of its predominant business activity.

It must be borne in mind that we are not now dealing with the inclusive words of Section 4 of the Bankruptcy Act, but with words of exception, and that the considerations which determine the content of one class do not necessarily apply to the other. From time to time Congress has changed the description of the persons or corporations to whom the privileges of bankruptcy may be accorded. Thus the provisions of the Act of 1867, § 37, 14 Stat. 535, were made applicable to moneyed business and commercial corporations; and these words were interpreted to include railroad companies, insurance companies and banks, while excluding municipalities. The Act of 1898, 30 Stat. 547, changed the description of the included class and granted the privilege of bankruptcy to corporations engaged principally in manufacturing, trading, printing, publishing, mining or mercantile pursuits; and it was under this Act that the courts held that the susceptibility to bankruptcy of a corporation does not depend upon its charter, but upon what it actually does. See In re Kingston Realty Co., 2 Cir., 160 F. 445; Cate v. Connell, 1 Cir., 173 F. 445. These decisions were especially persuasive in considering a statute whose criterion was the business in which the debtor was "engaged principally", but they have been cited in more recent cases and are relied upon by the appellee in the pending case with little reference to the change of verbiage in Section 4 of the Act that has subsequently taken place. See In re Dairy Marketing Ass'n of Fort Wayne, D.C.Ind., 8 F.2d 626; In re Roumanian Workers Educational Ass'n, 6 Cir., 108 F.2d 782.

The test established by the Act of 1898 excluded railroad, insurance and banking corporations, but it gave rise to difficulties of legal definition and controversies of fact that impeded the administration of the law; and therefore the Amendment of 1910, now contained in Section 4 of the Act, restored the words of the Act of 1867 and with certain exceptions again made bankruptcy available to "any moneyed, business, or commercial corporation". We may assume for the purposes of the pending case that when a bankruptcy court is called upon to decide whether a corporation debtor is a moneyed, business or commercial corporation within the general phrase, it should ascertain what has been the principal business of the debtor and be governed accordingly. See In re Wisconsin Cooperative Milk Pool, 7 Cir., 119 F.2d 999; Finletter, The Law of Bankruptcy Reorganization, pp. 107-9; Gerdes 1 Corporate Reorganization, 165. But we must still determine what reasons led Congress to exclude municipal, railroad, insurance and banking corporations from the purview of the Act, and what interpretation should be given to the excepting clause. Had it not been for this clause, railroad, insurance and banking corporations would again have become subject to bankruptcy by the restoration of the inclusive words of the Act of 1867. The purpose of the exclusion, we think, was correctly described by Judge Sibley in the following passage from In re Supreme Lodge of the Masons Annuity, D.C.N.D.Ga., 286 F. 180, 184, which has found wide acceptance in the federal circuits:

" * * * No reasons for making these exceptions were assigned by the committees of Congress, but they may be surmised to lie in the public or quasi public nature of the business, involving other interests than those of creditors, in the desirability of unarrested operation, the completeness of

state regulation, including provisions for insolvency, and the inappropriateness of the bankruptcy machinery to their affairs.

"These considerations all apply to insurance corporations. That the business generally may be declared affected with a public interest and subject to extensive regulation was recognized in German Alliance Ins. Co. v. Kansas, 233 U.S. 389, 412, 34 S.Ct. 612, 58 L.Ed. 1011, L.R.A.1915C, 1189. All states, probably, have in fact regulated insurance companies of all kinds, and provided for their liquidation. The affairs of an embarrassed or insolvent insurance company often require much technical skill and judgment and time for their adjustment and a carrying forward of the business, to prevent lapses and to permit reinsurance to simplify them. And considering the variety of insurance obligations assumed and the various statutes thereof, a chief practical difficulty is the ascertainment of who are really to be considered creditors and in what amounts, often requiring much time and elaborate accounting for its solution. Under such circumstances even the election of a trustee in bankruptcy could be difficult, and a creditors' meeting could hardly prosecute any business, owing to conflicting interests of the various classes of claims."

This view was again expressed in the same circuit (5th) in Woolsey v. Security Trust Co., 5 Cir., 74 F.2d 334, 337, 97 A.L. R. 1081. The court said: "The letter of that section excludes banking and insurance corporations; its spirit and purpose, to leave the liquidation of the banking corporations of the country to the well-organized departments of the states and the nation, organized for the purpose of supervising while they are going concerns and of liquidating them when they are not, excludes them. Federal laws provide elaborately for the supervision and liquidation of national banking corporations; the laws of the states do the same for state banks and insurance companies, in order to protect the millions of persons who deal with them on the faith of the protection afforded by direct governmental supervision and control. It was considered that it would be a ruinous thing to the state, to the depositors, and to the creditors to have the elaborate scheme of liquidation which the state provides broken into and nullified by bankruptcy proceedings, and it was intended by withdrawing jurisdiction over these corporations from the bankruptcy court, that this would not occur. It would be directly contrary to the purposes so definitely and comprehensively expressed, to exempt banking corporations from the act, leaving their administration and liquidation to the state and federal systems devised expressly for them, to hold that this bank and trust company is not exempt, chartered though it was under the state banking laws, with banking privileges and powers, operated though it was under those laws, and now being liquidated, as it is, under them."

See also, Grand Lodge, Knights of Pythias v. O'Connor, 5 Cir., 95 F.2d 477.

The interpretation of the exceptions has been outlined in other decisions where it has been pointed out that since Congress did not define the characteristics of the excepted corporations, the state statutes must be looked to in each case in order to determine the correct classification. Thus in In re Union Guarantee & Mortgage Co., 2 Cir., 75 F.2d 984, 985, the court said:

"The purpose of the exception is not self-evident; we must infer it as best we can from such similarity as exists between the excepted groups. All except municipalities are companies for profit whose businesses are now generally regarded as 'affected with a public interest'; that is to say, as touching enough persons who must deal with them at some economic disadvantage, to require public supervision and control. And municipalities are even more directly within public control. The most natural inference is that Congress meant to leave to local winding up statutes the liquidation of such companies; that, since the states commonly kept supervision over them during their lives, it was reasonable that they should take charge on their demise. Columbia, etc., Co. v. South Carolina, [4 Cir.], 27 F.2d 52, 59 A.L.R. 665; In re Grafton G. & E. Co., D.C., 253 F. 668. Cf. In re Hudson River Power T. Co., [2 Cir.], 183 F. 701, 33 L.R.A.,N.S., 454. Now it is the powers conferred upon the company, not its activities, which are decisive. Gamble v. Daniel, [8 Cir.], 39 F.2d 447; Clemons v. Liberty Savings, etc., Co., [5 Cir.], 61 F.2d 448. So far as In re Supreme Lodge of Masons Annuity, D.C., 286 F. 180, holds otherwise it cannot be accepted. If a state enacts that companies having powers of a prescribed kind must be regulated, that is of course authoritative; and, if in addition it classes the company as a bank or a railroad or an insurer, that too should be authoritative. [State of] Kansas v. Hayes, [10 Cir.], 62 F.2d 597; Security B. & L.

Ass'n v. Spurlock, [9 Cir.], 65 F.2d 768. This is true, not because Congress was bound to yield in such cases, but because otherwise its apparent purpose to leave the winding up of such companies to the state would not be effected; for the will of the state is no clearer to supervise the company than to class it as it does. When Congress excepted not all companies affected with a public interest, but specified kinds of such company, presumably it intended the states to define the kinds.

"* * * What Congress meant by an insurance company in the income tax. law has nothing to do with its meaning in the Bankruptcy Act. It is true that this makes the meaning of section 4 depend upon local laws and subjects that meaning to change as those laws change; pro tanto, Congress has delegated its power. But this is not the only instance in the Bankruptcy Act; thus exemptions are dependent upon local law, section 6, 11 U.S.C.A. § 24, and so are the priorities among claims, section 64b (7) as amended, 11 U.S.C.A. § 104(b) (7). Hanover National Bank v. Moyses, 186 U.S. 181, 22 S.Ct. 857, 46 L.Ed. 1113; Stellwagen v. Clum, 245 U.S. 605, 38 S.Ct. 215, 62 L.Ed. 507. It is by no means true that Congress may in no circumstances delegate its powers to the states, provided that in the main the resulting system be uniform."[3]

In State of Kansas v. Hayes, 10 Cir., 62 F.2d 597, 599, the court said: "It is thus seen that under the many provisions of the statutory law of this state trust companies are made banking corporations. That it was not intended by the Legislature of the state that trust companies should be operated, or, in case of insolvency, the affairs of such corporations should be wound up in bankruptcy, the assets converted into cash and distributed under the provisions of the Bankruptcy Act, and that a discharge of the corporation, and its stockholders and directors should be granted from its remaining indebtedness. Of course, it is undoubtedly within the power of Congress to make trust companies of the state, or any other natural or corporate body, or unincorporated company subject to the National Bankruptcy Act, and, if this were done in clear and unequivocal terms, all state laws for their operation in conflict with the act

must then be held to yield to the higher force, the national law. But, in the absence of any such express provision of the National Bankruptcy Act, in view of the state laws to which we have referred, and others, it must be held, we think, the provisions of the National Bankruptcy Act do not apply."

Like reasoning was employed in interpreting the meaning of the exception of building and loan associations from bankruptcy by the Act of February 11, 1932, 47 Stat. 47, 11 U.S.C.A. § 22. With respect to this additional exception, it was said in Security Building & Loan Ass'n v. Spurlock, 9 Cir., 65 F.2d 768, 770, 771:

"* * * It is suggested that this phrase, 'building and loan association,' might well be interpreted uniformly by the federal courts in exercising bankruptcy jurisdiction disregarding the definition thereof by the authorities of the individual states whether such definition is legislative or judicial, and that, consequently, we must seek for a reasonable definition of a term of general application and then determine whether the local legislation authorizes the incorporation of such a building and loan association and also whether the alleged bankrupt is such a corporation or association. However desirable such a conclusion might be, the fact is that a building and loan association is entirely a creature of state statute and the statute authorizing its creation must necessarily define its characteristics. Consequently, we must look to the state statutes to determine the nature and character of the corporate organizations it authorizes to function as building and loan associations. It may be conceded that the mere name of 'building and loan association' would not control in the determination of the question as to the character of the corporation, although the fact that the corporation is designated in its name and in its articles of incorporation as a building and loan association is certainly persuasive, if not controlling, evidence of its character.

"* * * when Congress enacted this legislation without any attempt to define the characteristics of the building and loan associations intended to be excluded from the operation of the Bankruptcy Act, it necessarily recognized the various definitions thereof in the statutes of the several states

---

[3] The statement in In re Supreme Lodge of the Masons Annuity, D.C., 286 F. 180, 183, that a corporation, which is an insurance corporation in the meaning of Congress is such in every state, regard-less of the name locally attributed to it, is expressly disapproved in this decision, and is also impliedly disapproved in the later decision in the Fifth Circuit cited above.

as indicating what constitutes a building and loan association in the respective states. To attempt by judicial construction to incorporate into the federal law some definition of a building and loan association would be in effect to legislate upon that subject. 'Congress was satisfied to take the state statutes as they found them and we must do so."

These authorities establish the rule that in determining whether a corporate debtor is a member of the excepted classes, the provisions of the state law must be given predominating influence. This is not to say that the classification of a state statute must be followed literally in every instance without any regard whatsoever to the real activity of the corporate body. The course of decisions, even in the Second Circuit, where perhaps the rule of state classification has been most strongly stated, indicates that the spirit rather than the letter of the local statutes should prevail; In re Prudence Co., 2 Cir., 79 F.2d 77; Empire Title & Guar. Co. v. United States, 2 Cir., 101 F.2d 69; and the mere fact that a state may have provided for state supervision and liquidation of a kind of corporation does not of itself bring them within the excepted class. In re Prudence Co., supra; Capital Endowment Co. v. Kroeger, 6 Cir., 86 F.2d 976.

Exclusion of the debtor from bankruptcy in the pending case does not call for an extreme or literal application of the rule of state classification. It is true that for many years the debtor dealt exclusively in the sale of annuity contracts and assumed the status of a life insurance company only a short time before the receivership under a stress of circumstances that finally put an end to its business altogether. But the change was actually made, and the debtor did engage in the business of life insurance during its last three months of activity by the issuance of thousands of life insurance policies, while continuing to a limited extent its annuity business. This combination of activities is precisely that which a life insurance company in West Virginia is authorized to perform by Chapter 33 Article 3 Section 7 of the West Virginia Code, which is as follows: "Life insurance companies chartered by and doing business in this State, and empowered to make contracts contingent upon life, may grant and issue annuities, either in connection with or separate from contracts of insurance based upon life risks, and all such annuities heretofore issued by such companies shall be valid."

There can be no doubt, therefore, that the Fidelity, by reason of its twofold activities, should be classified as an insurance company under the West Virginia law. Since the company deliberately assumed this new character to escape the requirements of the new federal and state statutes with respect to annuity companies, no weight should be given to the company's attempt to pose as an annuity company in the pending petition in bankruptcy. Moreover, the corporation would have been classed as an insurance company under the laws of the majority of the states as they existed in 1910, when the excepting clause in the Bankrupty Act was passed. At that time, the laws of twenty-eight states,[4] including West Virginia, classified a life insurance company as a corporation formed to insure the lives of persons and to grant,

4 Revised Statutes of Arizona (1901) Title 13, Ch. 3, Insurance Corporations, § 797; California Political Code (1909) § 594; Colorado Rev.Stat. (1908) § 3116, p. 841; General Statutes of Connecticut (1902) § 3540; Revised Statutes of Illinois, Hurd (1909) Ch. 73, Insurance, § 177; Burns' Annotated Indiana Statutes, Revision of 1908, Vol. 2, § 4678; General Statutes of Kansas, Dassler, (1909), § 4111; Statutes of Kentucky, Russell (1909) Life Insurance and Life Insurance Companies, Art. 7, § 4366; Marr's Annotated Revised Statutes of Louisiana, Vol. 2, p. 1217, § 3563; Public General Laws of Maryland, (1904) Vol. 1, Art. 23, § 148; General Laws of Massachusetts (1921) Vol. 2, Ch. 175, § 118; Compiled Laws of Michigan, (1915) Vol. 2, p. 3375, § 9323; Revised Laws of Minnesota (1905) § 1687; Mississippi Code (1906) § 2598; Revised Statutes of Missouri (1909) Vol. 2, § 6895; Revised Codes of Montana (1907) § 4016; Compiled Statutes of New Jersey (1709-1910) Vol. 2, p. 2838, § 1; "Act of Mar. 17, '09, L. '09, C. 48, § 25" New Mexico Statutes Annotated (1915) § 2846; Consolidated Laws of New York (1909) Vol. III, Insurance Law, Art. 2, § 70; Revisal of 1905 of North Carolina, Vol. 2, § 4773; General Code of Ohio (1910) Vol. 2, § 9339; Compiled Oklahoma Statutes, (1921) § 6666; Lord's Oregon Laws (1910) Vol. 2, § 4629; Brightly's Digest of Laws of Pennsylvania (1893-1903) p. 342; Vernon's 'Sayles' Texas Civil Statutes (1914) Vol. 3, Article 4724; Remington & Ballinger's Annotated Codes and Statutes of Washington, Vol. 2, § 6123;

purchase and dispose of annuities; and since 1910, seven additional states[5] have amended their statutes to include a like provision. The conclusion is that the Fidelity was an insurance company in 1941, whether its classification as such depends upon the statutes of West Virginia or upon the classification which prevailed generally amongst the states of the union when the Amendment was enacted. That Amendment excludes the corporation from the benefits of the Bankruptcy Act.

■ This conclusion leads very easily to a consideration of the contention of the appellants that the petition in bankruptcy should be dismissed under Section 144 of the Chandler Act, 11 U.S.C.A. § 544, for the additional reason that it was not filed in good faith as that term is employed in Section 146 of the Act, 11 U.S.C.A. § 546. Section 144 provides that if a controversial answer is filed by any creditor to the petition, the judge shall determine the issues presented and enter an order approving the petition if satisfied that it complies with the requirements of Chapter 10 and has been filed in good faith, or dismissing it if not so satisfied.

Section 146, insofar as material here, provides:

"Without limiting the generality of the meaning of the term 'good faith', a petition shall be deemed not to be filed in good faith if—

"(1) * * *

"(2) * * *

"(3) it is unreasonable to expect that a plan of reorganization can be effected; or

"(4) a prior proceeding is pending in any court and it appears that the interests of creditors and stockholders would be best subserved in such prior proceeding."

Our attention is drawn to Section 146(4) and to the question whether the interest of the contract holder will be best served by the continuance of the receivership proceeding instituted in the Circuit Court of Kanawha County in April 1941. In considering this question the discussion will be limited to the interests of the creditors, for it is apparent that the stockholders have no interest in the business. Commenting on the condition of the company's business, the District Judge said in his opinion (In re Fidelity Assur. Ass'n, D.C., 42 F.Supp. 973, 985, 986):

"The proceedings are not yet at a stage where the court is called upon to consider any particular plan of reorganization. It is true that the broad picture developed by the testimony at the hearing does not present a very favorable view with respect to the rehabilitation and continued operation of the debtor as a face amount certificate company. Whether the Fidelity plan is fundamentally unsound depends upon the definition given to that term. It is apparent that it is a plan of investment which yields a very low rate of income to the investor and subjects the investor to substantial loss should he cease to pay the required installments during the earlier stages of the contract; but this very element of weakness from the investor's standpoint strengthens the company from an operating viewpoint, provided the contracts can be sold in sufficient volume to take care of necessary overhead expenses. It is extremely doubtful whether, in view of unsettled economic conditions and the critical international situation, the Fidelity plan would any longer appeal to a large public; but it is not impossible; and it is not the duty of the court to decide for the public that investors will not or should not buy these contracts in the future.

"The fact that the company has not been operated profitably in the past is not shown to be the result of financial unsoundness in the plan itself. It has been due rather to an unsoundness in debtor's methods of management. Extravagant sales and promotion expenses; useless expenditures for lavish offices, including the home office building at Wheeling, West Virginia; overexpansion, particularly in states like Wisconsin, where the strictness of regulatory state laws made it impossible to operate at a profit; poor judgment in selection of the personnel to manage the company; these are the elements of unsoundness which have brought about the difficulties in which debtor now finds itself.

---

West Virginia Code (1907 Supp.) § 1107a17; Wisconsin Statutes (1911) § 1897.

[5] Digest of Statutes of Arkansas (1937) Pope, Vol. II, Sec. 7647; Idaho Code Annotated (1932) Title 40, secs. 301, 304; Code of Iowa (1935) Ch. 398, sec. 8673-e1;

Public Laws of New Hampshire (1926) Vol. 2, Ch. 272, sec. 1, subd. III; Revised Statutes of Utah (1933) Title 43, Ch. 3, sec. 2 (1); Public Laws of Vermont (1933), Ch. 277, Insurance Companies, sec. 6911; Wyoming Revised Statutes (1931) Ch. 57, sec. 223.

"The requirements of the Investment Company Act of 1940, establishing 7% of the total amounts paid in on contracts during their entire life as the maximum loading charge, are calculated to make the contracts more saleable, and, with proper economy and good judgment on the part of the management, a reasonable profit to the operating company is possible. This regulatory law has not had the effect of banishing all such companies from the region of commercial operation. The testimony discloses that at least one other such company is still in operation, presumably with some measure of success.

"To conclude that unfavorable publicity concerning the affairs of any company must affect that company's prospects of future operation after being reorganized under Chapter X is to lose sight of the very purpose of such a reorganization. All the unfavorable publicity has been directed towards the unreorganized company. What I have said above concerning the reasons for the company's present financial condition indicates that in my opinion such unfavorable publicity has been amply justified; but it does not follow that if and when the company may be reorganized under the supervision of a United States Court it would retain any of the stigmata which it is the purpose of such reorganization to remove."

This resume of the District Judge presents a dark picture of the company's future. Nevertheless it suggests that some plan of reorganization not yet formulated,[6] much less proposed by any person financially able to carry it into effect, may not be impossible. We think it is our duty to review the situation realistically, and when this is done, there appears to be no reasonable hope of a reorganization of the business as a going concern, but only the immediate need of a liquidation of the company's assets for the benefit of the contract holders. Obviously there will be nothing left for the stockholders.

This conclusion is based in part upon the facts summarized in the quotation from the judge's opinion. For years past the business has not been profitable. In 1933 the company's liabilities exceeded its assets by $7,000,000. It recovered from this condition to such an extent that when the pending suit was filed in 1941, the unfavorable balance had been reduced to two and a half millions, and this was due in part to the rise in value of the company's securities and in part to the large increase in sales of annuities from an intensive sales campaign. But the improved situation was shattered when the suits were filed against the company in Michigan and in West Virginia in 1938 and 1939, and the company reaped a harvest of unfavorable publicity deservedly based upon its mismanagement and irregular transactions. The result was that a gross business of $52,000,000 in 1938 shrank to less than $12,000,000 in 1940, and the company was then losing money at the rate of $250,000 per year. Not a single contract has been sold since December 31, 1940 and the sales force upon which the life of the business depended has been dissipated and could be restored only at a cost of $500,000. Moreover, as the District Judge pointed out, it is quite doubtful whether this form of investment presents any further appeal to a public that has now been informed as to the nature of the business;[7] certainly the possibility that thousands of contract holders could be persuaded to modify their contracts and scale down their claims to enable

---

[6] Some memoranda looking toward the formulation of plans have been prepared but they do not purport to represent the proposal of any of the interested parties or to be sufficiently definite for submission to the creditors.

[7] The S.E.C. report (p. 113) compares the experience of a Series B contract holder without insurance with the experience of a holder of United States Savings Bonds over a period of ten years, based in each instance upon an investment by a purchaser of $100. The report states: "Throughout the 10 years of the comparison, the amounts recoverable to investors at any time are in favor of the United States Savings Bonds, the percentage of advantage ranging from 184.2% in the first year to 49.3% in the second year to 0.3% in the tenth year. Significant, too, is the fact that the United States Savings Bonds, bearing interest at the rate of 2.9% compounded semi-annually, have a greater aggregate value at the end of 10 years than the investment certificates of the Association, notwithstanding the "reserve fund" provisions of the certificates requiring the appropriation of installments received, less fixed but un-specified charges for administrative and agency expenses, together with interest thereon at 4½% compounded semi-annually. The difference shown by the comparison emphasizes the high costs deducted by the Association and borne by the purchasers of the certificates."

the company to go on is so remote as to exist only in the imagination. No proposal for the investment of new capital has been forthcoming. The facts underlying the whole situation are so clear that even the parties in this case who insist upon reorganization under the Bankruptcy Act hold out little hope of a resumption of the business as a going concern, and content themselves for the most part with the argument that reorganization in the statutory sense includes "a slow and orderly liquidation".

But, it is said that even if liquidation is inevitable, the interests of creditors would be best served by a retention of the case in the federal court. The argument is that in such event, the trustees would have title not only to the assets in West Virginia but also to the assets in all other states in which contracts were sold and deposits were made to secure them, that is, the trustee would have title not only to the ten million of deposits in West Virginia, but to the almost equal sum held by the authorities of the other states. Hence, it is said a more effective marshalling of assets and adjudication of claims could be had in the bankruptcy court than in the state court of West Virginia, since the receivers of the latter would have jurisdiction only over the assets in that state and would have no power under the established rule to bring suit to secure assets or surplus deposits held in other states. See, Booth v. Clark, 17 How. 322, 58 U.S. 322, 339, 15 L.Ed. 164; Great Western Mining Co. v. Harris, 198 U.S. 561, 25 S.Ct. 770, 49 L.Ed. 1163; Lion Bonding Co. v. Karatz, 262 U.S. 77, 43 S.Ct. 480, 67 L.Ed. 871. Such a surplus might occur, according to this contention, in one or more of the states, either because the deposits therein might exceed the total liabilities, or because the funds deposited to secure a certain form of contract might exceed the liabilities thereunder, and in either case creditors whose claims have not been paid in full would be obliged to file claims in every state in which such a surplus might be found.

Again, we are asked to consider possibilities, without substantial showing, that such surpluses probably will be found in any state other than West Virginia. Moreover, these arguments relate primarily to the interests of creditors whose claims are not secured or are insufficiently secured by deposits in their respective states. The majority of these contract holders live in the states of Ohio, Pennsylvania and Virginia, which adjoin West Virginia. The claims of all of the unsecured contract holders must necessarily be filed in West Virginia for there only a substantial surplus will surely be found. It will be as convenient for creditors to file their claims in the state as in the federal court. It is true that the West Virginia receivers may not bring suits in other states to secure control of deposits there in excess of local needs; but if such surpluses exist, it may be assumed that they will not be improperly withheld. In the event of controversy, suits can be brought without great difficulty by ancillary receivers appointed by the courts of other states for the purpose.

It has not been and cannot be reasonably contended that the interests of the well secured creditors will be advanced by interfering with the state officials in the prompt liquidation and distribution of the securities in their hands. The liquidation in every state in which deposits were made will be subject to the supervision of established governmental departments, as well qualified for the business as the trustee in bankruptcy. There is every reason to believe that the liquidation under their supervision will proceed without needless expense in a careful and expeditious manner so as to save as much as possible for the contract holders. Certainly it would be unjust and unreasonable to delay the satisfaction of their claims in order that illusory hopes of reorganization may be entertained. That which serves the interest of this group will also be to the advantage of the creditors in such states as Illinois (liabilities $4,225,790—market value of securities $3,759,894), where the contracts are secured by a very substantial but insufficient deposit.

Moreover, it must be borne in mind that the rights of the contract holders in the several states must be determined in each instance by the local statutes, and that these statutes must be interpreted in accordance with the decisions of the state courts. It is no reflection upon the federal court to suggest that the state courts of the fifteen states are better qualified to construe and apply their own laws. Considerations of this kind were doubtless influential with Congress in excepting from the Bankruptcy Act those corporations, such as insurance, railroad and banking corporations, whose business during their active life and whose liquidation in case of insolvency are strictly regulated by state law. Indeed, in deciding that it is to the best interests of the

creditors of the Fidelity that the proceeding in the state court of West Virginia be not superseded by the proceeding in bankruptcy, we are merely following the example set by Congress. See, In the Matter of Poloma Estates, Inc., 2 Cir., 126 F.2d 72.

The District Judge also referred in his opinion to the fact that one of the receivers appointed by the Circuit Court of Kanawha County, West Virginia, is a law partner of a director who served on the Board of the Fidelity for many years; and the suggestion is made that the state court receivers would not be likely to proceed diligently against the directors if an investigation should disclose the existence of some liability on their part to the corporation's creditors. No specific facts are set out in this respect, but if such facts exist and the necessity for a proceeding against the directors should arise, we have no reason to suppose that the state court will not do its full duty in the premises.

Our conclusion is that the petition should be dismissed. The order of the District Court will be reversed and the case remanded for further proceedings consistent with this opinion.

Reversed and remanded.