In the Matter of MANDALAY SHORES COOPERATIVE HOUSING ASSOCIATION, Debtor.

Bankruptcy No. 81–547.

United States Bankruptcy Court, M. D. Florida, Tampa Division.

July 13, 1982.

right

Jawdett Rubaii, Clearwater, Fla., for debtor.

William Borja, Clearwater, Fla., for Smith, et al.

Mary Lou Wagstaff, Largo, Fla., for Fultons, et al.

Helen Ellis, Tallahassee, Fla., for Dept. of Business Regulation.

## ORDER ON MOTION TO DISMISS OR CONVERT

ALEXANDER L. PASKAY, Chief Judge.

THIS IS a Chapter 11 proceeding and the matter under consideration is a Motion to Dismiss the case or, in the alternative, to convert it to a Chapter 7 proceeding. The Motion was filed by Walter N. Smith and various other individuals who refer to themselves as equity security holders. The movants contend that the absence of a reasonable likelihood of rehabilitation of the Debtor coupled with continuing losses to the estate compel the conversion or dismissal of this case pursuant to § 1112(b)(1).

The facts germane to the resolution of this Motion under consideration are as follows:

The Debtor, Mandalay Shores Cooperative Housing Association (MSCHA) is an association organized under Fla.Stat. § 617.01 as a non-profit corporation. The association was formed by the tenants of an apartment house complex commonly known as Mandalay Shores. The complex is located in Clearwater Beach, Florida and, at the time MSCHA was formed, the complex was owned by the Department of Housing and Urban Development (HUD).

The record reveals that MSCHA was formed for the singular purpose of acquiring the apartment house from HUD in order to prevent a sale of the complex by HUD to a private entrepreneur who most likely planned to convert the apartment units to condominiums in order to maximize the return on his investment. Specifically, the tenants of Mandalay Shores, most of whom are senior citizens, feared that the sale by HUD to a private developer would result in the loss of their very advantageous leases even if the complex is not converted into a condominium project. Inasmuch as most of the retiree-tenants are not in the financial position either to purchase a condominium unit or to pay an increased rent, their fear was not unfounded and is understandable. Faced with these frightening prospects, it is not surprising that the tenants of the complex were anxious to join forces initially hoping that their combined efforts and resources would assure the preservation of the status quo and their tranquil life, free of fear of losing their well established residence and free of anxiety over their future.

Initially it appeared that MSCHA might be able to achieve its goal. It soon developed, however, that in spite of numerous and vigorous, albeit, unsuccessful attempts, first on an administrative level and later in the various courts, it never had a chance to succeed simply because HUD refused to consider MSCHA as a qualified buyer.

To finance its mission, MSCHA collected over $1 million from its members. Each member paid approximately $3,200 and obtained a receipt from the Association evidencing the amounts paid by the members.

The receipt stated that in the event MSCHA's attempts to purchase the complex proved unsuccessful, a general meeting of all members of the Association would be held in order to decide by majority vote on the next step to be taken by the Association.

When it finally became evident that MSCHA's initial efforts to negotiate with HUD for the purchase of the complex were getting nowhere, MSCHA decided to intensify its attack and, as noted earlier, embarked on an extensive course of litigation. First, it filed two actions in the federal district court. One of these suits was an action based on the Clean Air Act, 42 U.S.C. §§ 7601 et seq., in which it was claimed that HUD should be prohibited from selling the apartment complex until certain toxic asbestos insulating material was removed. The other suit filed in the federal district court was based on the National Housing Act. The purpose of this suit was also to block a then pending sale of the complex to a private entrepreneur and it also sought to compel HUD to convey the building to MSCHA. When the district court denied the reliefs requested in both of these suits, MSCHA filed an appeal to the Eleventh Circuit Court of Appeals. In addition, it also sought emergency injunctive relief.

At this point, some of the members of the Association became disenchanted with the management and requested that their contributions be returned. Although MSCHA in fact returned some of the contributions, notably to those the management considered to be "trouble makers," others were unsuccessful and decided to file suit against MSCHA. On November 15, 1979, the suit was, in fact, filed in the State Court. The Department of Business Regulations, Division of Land Sales and Condominiums of the State of Florida (State of Florida) filed a Motion and sought to intervene on behalf of all members of MSCHA seeking the same relief. On May 16, 1980, the Circuit Court granted the Motion and permitted the State of Florida to intervene. On May 2, 1980, the Circuit Court entered an order; froze all assets of MSCHA; issued an injunction prohibiting the expenditures of

any funds of MSCHA for any purpose; and appointed Clyde E. Renfroe, Jr. as receiver for all assets of MSCHA. MSCHA took two appeals from these orders to the Second District Court of Appeals. The appeal directed to the first order, i.e. the order which froze the assets, was dismissed by an order dated June 19, 1980. The order appointing the Receiver was affirmed by an order dated August 13, 1980.

The institution of the suit by members of MSCHA who sought to recover their contributions also triggered a flurry of litigation by MSCHA, who sued the Circuit Court Judge and the State Court Receiver. This action was dismissed on May 9, 1980. Notwithstanding these series of defeats, the management of MSCHA did not give up and sought a disqualification of the Circuit Court Judge or his removal by filing a petition for a writ of prohibition. This was also denied by the Court of Appeals as were some further attempts to obtain relief in the State Court.

When it became obvious that MSCHA would not be able to obtain any relief in the state court, it filed its voluntary petition for relief on April 3, 1981, hoping that the protective umbrella, available to debtors in the Bankruptcy Court, would finally furnish the necessary protection and a breathing spell. Most importantly, it hoped the filing would enable the management to use the extraordinary powers of a debtor-in-possession to achieve what it was not able to achieve through extensive and complex litigations in several nonbankruptcy forums.

Notwithstanding this flood of litigation, HUD proceeded to offer the complex for sale by inviting sealed bids. MSCHA attempted again to block the bidding process, albeit, without success. Realizing this, MSCHA submitted its own bid. In due course, the bids were opened and the sale was awarded to the highest bidder, presently the Bank of Clearwater, acting as Trustee for the actual purchaser. Although HUD deeded the property over to the Bank, the sale is contingent on the successful resolution of all pending litigations, including

all appeals. Thus, theoretically, if MSCHA ultimately prevails, it is still possible, although very unlikely, that the sale to the Bank would be nullified and the deed to the Bank would be cancelled.

It is not surprising that this flurry of activity in the courts by MSCHA, not only in the State and Federal, but also in the Bankruptcy Court, and in the complex itself, has created turmoil among the members and established basically two factions. One faction is composed of the original dissenting members who sought to obtain a full refund of their contributions with interest, attorney fees, and punitive damages; the other is composed of those who still remain loyal to the management and hope against hope that one day in some court somewhere they will prevail, or HUD itself, will have a change of heart, set aside the sale and open the way for MSCHA to purchase the complex. Some of the members of this group also appear to be willing to accept the idea that the original purpose of MSCHA and its justification for its existence, i.e. the purchase of Mandalay Shores, is not really that important and could be discarded and the monies collected could be used for the purchase of another apartment complex for the use and benefit of the members of the Association.

To further complicate matters, and to add to the already charged atmosphere in the complex, MSCHA demanded from the members, from time to time, additional contributions by way of assessments. This in turn, of course, was an additional shock and an unexpected trauma to some members of the Association who were faced with the dilemma of throwing away additional good monies, which they can hardly afford, after their initial contribution representing substantial part of their life savings monies which are believed to be bad monies or losing their "good standing" as members of the Association and, according to the management, losing their right to be heard and vote.

As noted earlier, the receipt given to the members stated that in the event MSCHA was unable to purchase Mandalay Shores, the membership would decide on what other action should be taken and such decisions would be made only, according to the management, by members in good standing. It is the position of the management that members who demanded the return of their contribution or who refused to contribute additional funds as requested by the management no longer wear the badge of "good standing" and are not entitled to participate in the corporate affairs having forfeited their membership rights and all their contributions. In support of this position, Management cites the case of *Clearwater Citrus Growers Assoc. v. Andrews*, 81 Fla. 299, 87 So. 903 (Fla.1921), in which case, the Supreme Court of Florida held that the voluntary withdrawal of members of a nonprofit corporation terminates their memberships in the corporation and serves all connection with and interest in its business property and assets.

This is the relevant history of this complex and emotionally charged case which furnishes the backdrop against which the Motion to Dismiss this case under consideration should be viewed and the issues raised by the Motion be resolved.

■ Counsel for the movants argues that the frustration of the Debtor's corporate purpose coupled with an inability to reorganize makes this case ripe for conversion to Chapter 7 case where a trustee could expeditiously effectuate the orderly liquidation of the Debtor's assets and distribute the funds on deposit. Although this Court is in complete agreement that conversion would be the most equitable and just solution, this case cannot be converted to a Chapter 7 because of the clear prohibition stated in § 1112(c) of the Bankruptcy Code. As counsel for MSCHA points out, in the absence of a request by the Debtor, § 1112(c) of the Code prohibits the conversion of a Chapter 11 proceeding to a Chapter 7 if the Debtor is a "non-moneyed, non-business or non-commercial corporation." Although the Code does not define these phrases, they acquired a specific meaning by judicial interpretation according to which their application is limited to corporations organized

as not for profit. *Hoile v. Unity Life Insurance Co.*, 136 F.2d 133 (4th Cir. 1943); *In re Allen University*, 497 F.2d 346 (4th Cir. 1974). In addition, in determining whether a debtor corporation is included in the exception set forth in § 1112(c), courts have looked to several sources, including the provisions of state law, *Sims v. Fidelity Assurance Assoc.*, 129 F.2d 442 (4th Cir. 1942); the articles of incorporation, *In re Allen University, supra* and the actual character and activities of the corporation, *Hoile v. Unity Life Insurance Co., supra.*

■ In the case under consideration, the Debtor was organized as a non-profit corporation under Fla.Stat. § 617.01. This Section defines a non-profit corporation as a "corporation no part of the income of which is distributable to its members, directors, or officers." Under Florida law, it is clear that an entity which operates and manages a cooperative apartment house may be chartered as a non-profit corporation. 205 Op.Att'y Gen. 769 (1960). Thus, a corporation organized for the purpose of securing financing under the FHA program may be registered as a non-profit corporation. 37 Op.Att'y Gen. 494 (1960). Moreover, an examination of the Debtor's articles of incorporation fails to reveal a profit-motivated purpose and there is no proof that MSCHA distributed any of its income, income derived solely from the interest earned on the funds contributed by the members or paid any dividends or bonus to the members, directors, or officers. Accordingly, it is clear that MSCHA is not amenable to an involuntary proceeding because it is a non-moneyed, non-commercial, non-business corporation and as such cannot be forced into a Chapter 7 liquidation case. For this reason, this case cannot be converted into a liquidation case.

This leaves for consideration a second alternative, dismissal of the case. Relying upon § 1112(b)(1) of the Code, counsel for the movants again urges that dismissal is proper because of the continuing loss to the estate and the absence of a reasonable likelihood of rehabilitation. Counsel stresses that the primary, if not the only raison d'etre of this debtor is the continuing attempt to acquire the apartment complex, i.e. Mandalay Shores, through litigation. To view this case in the context of a Chapter 11, one can hardly doubt or even wonder if this case is or if it ever was a business reorganization case. This Debtor is not, and has never been, engaged in the conduct of any ongoing business in an orthodox sense. Its only business has been, so far, defending or prosecuting law suits. However, the defense or prosecution of litigation by a debtor seeking a reorganization under Chapter 11 of the Code does not bear any resemblance to a business operation, although it is clear that litigation is a substantial and important business for counsel for MSCHA. However, it is not the attorneys of MSCHA who are the debtors in a Chapter 11 case and, as far as it appears from the record, they are not in need of any relief under Chapter 11 of the Code, although applications for interim attorney fees filed by them presently pending before this Court exceed $200,000. It has been recognized under the pre-Code law that the relief Chapters of the Bankruptcy Act of 1898 were not designed as relief chapters for attorneys, *In re Orbit Liquor Stores*, 439 F.2d 1351 (5th Cir. 1971). There is nothing in the Bankruptcy Code or in the legislative history of the Code to indicate that this basic, self-evident principle is no longer valid in spite of the more liberal standard placed on allowance of attorney fees by Congress set forth in § 330 of the Code.

Since the case cannot be converted to a Chapter 7 case for reasons stated, dismissal appears to be the only alternative. There are, however, several reasons which militate against the dismissal.

■ First, as noted earlier, there is an adversary proceeding presently pending in this Court in which several disenchanted members of MSCHA claim that persons in charge of the Association have been guilty of gross mismanagement and for this reason they seek a return of their original contributions and punitive damages and attorney fees. If this case is dismissed, these plaintiffs might successfully pursue their

claims in State Court, and would receive a greater share of the funds of the Association which in turn would deprive the other members who are not plaintiffs in the action of their right to obtain a refund. It is equally clear that members who diligently and swiftly pursue their own remedies against MSCHA, if the case is dismissed, will be paid first while the less diligent and less alert members would possibly receive nothing. To permit a race to the courthouse, which would produce an unequal scheme of distribution, is an outcome which is not only unfair, but contrary to the well established principle that courts of bankruptcy are courts of equity, *Bank Marin v. England*, 385 U.S. 99, 87 S.Ct. 274, 17 L.Ed.2d 197 (1966) and would produce an unfair result in violation of the age-old principle that equality is equity. In addition, if this case is dismissed, the refund to the members will be further delayed by additional litigation, and the funds further diminished by additional attorney fees and costs.

There is one other possible resolution of this dilemma. Section 1104(a)(2) of the Code permits the appointment of a trustee in a Chapter 11 proceeding if the interest of creditors, equity security holders will be served by such an appointment. The Code further provides that a Chapter 11 trustee may propose a plan of liquidation and if the plan is confirmed, proceed expeditiously with the orderly distribution of the estate. Unfortunately, § 1104(a)(2) of the Code poses an obstacle to this route of relief simply because a trustee may only be appointed on request of a party in interest and only after notice and hearing. Since the Court is clearly not "a party in interest," it may not, on its own motion, order the appointment of a trustee under this Section. *In re Gurwitch*, 6 BCD 264 (Bkrtcy S.D.Fla.1980).

In summary, all of the foregoing alternatives are beset with difficulties which interfere with the effective disposition of this case. Nevertheless, after careful consideration, this Court is constrained to conclude that because of this seemingly non-resolvable dilemma which has the unmistakable traits of a catch-22 situation, no choice remains but to grant the Motion to Dismiss. However, the dismissal shall be suspended for 20 days from the date of entry of this order in order to allow parties in interest to seek either an appointment of a trustee pursuant to § 1104 of the Bankruptcy Code or to seek a reconsideration of this order, if they are so deemed to be advised.

Accordingly, it is

ORDERED, ADJUDGED AND DECREED that the Motions to Convert filed by Walter N. Smith, et al be, and the same hereby is, denied. It is further

ORDERED, ADJUDGED AND DECREED that the Motion to Dismiss filed by Walter N. Smith, et al be, and the same hereby is, granted. It is further

ORDERED, ADJUDGED AND DECREED that the effectiveness of this order is suspended for 20 days from the date of the entry of this Order.